R. Keith **CULLINAN** and Cullinan Associates, Inc., Plaintiffs–Appellees,

v.

Jerry E. **ABRAMSON**, Christina Heavrin (95–5416), Stuart P. Jay, Earl Mac Unger, John H. Nevin (95–5417), Samuel D. Hinkle IV, Culver V. Halliday, Greenebaum, Treitz, Brown & Marshall (95–5418), and William C. Boone (95–5419), Defendants–Appellants,

City of Louisville, Defendant.

Nos. 95–5416 through 95–5419.

United States Court of Appeals, Sixth Circuit.

Argued March 7, 1996.

Decided Oct. 16, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 18, 1997.

Ann B. Oldfather (argued), Jennifer J. Hall (briefed), Oldfather & Morris, Louisville, KY, for Plaintiffs–Appellees.

Mary J. Lintner (briefed), Donald L. Cox (argued and briefed), Lynch, Cox, Gilman & Mahan, David L. Leightty (briefed), Louisville, KY, for Jerry E. Abramson.

Donald L. Cox, Lynch, Cox, Gilman & Mahan, Louisville, KY, for City of Louisville.

William H. Hollander (briefed), Frank W. Burke, Sr. (briefed), Wyatt, Tarrant & Combs, Mary J. Lintner, Donald L. Cox, David L. Leightty, Lynch, Cox, Gilman & Mahan, Louisville, KY, for Christina Heavrin.

William H. Hollander (briefed), Frank W. Burke, Sr. (briefed), Wyatt, Tarrant & Combs, David L. Leightty, Lynch, Cox, Gilman & Mahan, Louisville, KY, for Stuart P. Jay.

William H. Hollander, Wyatt, Tarrant & Combs, David L. Leightty, Lynch, Cox, Gilman & Mahan, Louisville, KY, for Earl Mac Unger.

William H. Hollander, Wyatt, Tarrant & Combs, Louisville, KY, for John H. Nevin.

Virginia H. Snell (briefed), K. Gregory Haynes (briefed), Wyatt, Tarrant & Combs, Frank P. Doheny, Jr., Hirn, Doheny & Harper, Louisville, KY, for Samuel D. Hinkle, IV and Culver V. Halliday.

K. Gregory Haynes, Wyatt, Tarrant & Combs, Frank P. Doheny, Jr., Michael M. Hirn, Hirn, Doheny & Harper, Louisville, KY, for Greenebaum, Treitz, Brown & Marshall.

William C. Boone, Jr. (briefed), Law Offices of William C. Boone, Louisville, KY, pro se.

Before: NELSON and SILER, Circuit Judges, and WISEMAN, District Judge.*

DAVID A. NELSON, Circuit Judge.

The plaintiffs—independent investment managers who handle a portion of the assets of a Louisville, Kentucky, police pension fund—brought a federal civil rights/RICO lawsuit against the city, its outside lawyers, the mayor, and other city officials, all of whom were said to have been involved in efforts to have the plaintiffs fired as investment managers for the pension fund. The

defendants moved for dismissal of the complaint under Rule 12, Fed.R.Civ.P., asserting, among other defenses, absolute and qualified immunity from suit on both the federal claims and numerous pendent state law claims by which the federal claims were accompanied.

The district court largely denied the motions to dismiss, and each of the defendants except the city perfected an interlocutory appeal from the denial of immunity. The plaintiffs then moved to dismiss the appeals on finality and substantiality grounds, but another panel of this court ruled against the plaintiffs on these issues.

We now conclude that the appellant defendants are entitled to qualified immunity on the federal claims. The denial of such immunity will be reversed. In remanding the case, we shall give the district court an opportunity to consider the appropriate disposition of the state law claims in light of our ruling on the federal claims.

I.

The plaintiffs' allegations are set forth in a 33–page complaint, a 14–page affidavit, and 13 exhibits. We accept as true, for present purposes, all well-pleaded, non-conclusory allegations contained in the plaintiffs' papers.

A. Background—Plaintiffs

In the mid–1960s, it appears, the City of Louisville established a pension system for its police officers. The system, which is operated by a governing body commonly referred to as the board of trustees, is funded with appropriations from the city and with contributions from participating police officers.

The trustees of the pension fund engaged Stock Yards Bank & Trust Co. to manage a portion of the fund's assets. In 1977 plaintiff R. Keith Cullinan, who was employed by the bank as a trust officer for a number of

* The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of

years,[1] was placed in charge of investing these holdings.

Since January of 1990 Mr. Cullinan has been the president and chief executive officer of plaintiff Cullinan Associates, Inc., an investment management firm of which Mr. Cullinan is a shareholder. Through Cullinan Associates he has continued to manage a portion of the police pension fund's assets. Cullinan Associates is compensated for its services by fees that are generally set as a percentage of the assets under its management.

In his work for the pension fund, both as an employee of the bank and as an employee of Cullinan Associates, Mr. Cullinan has made extensive use of a technique known as covered call option writing. A call option is a contract that gives the purchaser of the option the right to buy shares of stock in a specified company at a specified price within a specified period of time. If the market price of the stock fails to rise above the specified price before the option has expired, the holder of the option will have no incentive to exercise the call, and the seller (or "writer") of the option will get to keep the premium paid by the purchaser without having to part with any shares of stock. If the market price of the stock does rise above the price specified in the option, on the other hand, the holder of the option can be expected to exercise the call—and the writer of the option, while still retaining the premium, will have to part with the stock for less than its current worth.[2]

If the writer of the option does not already own the stock—if the option is "naked," in the argot of the trade—the writer will have to buy shares on the open market in the event of a call. But the option writer need not buy shares if the option is "covered;" the writer of a covered option can meet the call with stock the writer already owns. The writing of covered options is thus considered more conservative than the writing of naked options.

Both techniques generate brokerage commissions that would not have to be paid if the options were not written. Stockbrokers benefit from option writing whether share prices rise, fall, or stay the same. If the market price of a security on which options have been written does not rise too much during the option period, the writer of the option likewise stands to benefit.

Although views differ as to the extent to which option writing makes sense from the option writer's standpoint, a majority of the members of the board of trustees of the police pension fund appear to have been well satisfied with the performance of the portion of the assets managed by Mr. Cullinan. A study conducted by a brokerage firm in March of 1988 showed that over the preceding ten years the assets managed by Mr. Cullinan produced an annual return of 14.75%. Another brokerage firm calculated that the return had been 15.01% per annum. The net return for 1992 was 11.5%, and for 1993 it was 13.2%. The record does not disclose what the returns would have been had Mr. Cullinan made the same stock selections without employing the covered option writing technique,[3] but the Cullinan affidavit says that during 1992 and 1993 the police pension fund made profits of $2,397,680 on covered call options that expired without having been exercised.

In addition to managing assets for the police officers' pension fund, Mr. Cullinan provided investment management services to the Louisville Firefighters' Pension Fund during a period that began in 1978 and ended in August of 1986. He used the covered call option writing technique for the firefighters' assets as well. The record does not disclose what percentage of the fund's total assets he managed, but Stock Yards Bank received more than half the city's 1985 contribution to the firefighters' fund. For the five years

Tennessee, sitting by designation.

1. Mr. Cullinan rose through the ranks to the position of executive vice president, and he became a member of the bank's board of directors.

2. For a price, of course, the option writer can buy back the option (or an equivalent option) at any time.

3. We do not know, similarly, whether Mr. Cullinan would have invested in the same stocks had he not planned to write options on them.

ended March 31, 1985, we are told, the performance of the total portfolio of the firefighters' fund was ranked near the top of a group of 100 comparable funds.

## B. Background—Defendants

In November of 1985 defendant Jerry E. Abramson was elected mayor of the City of Louisville. After taking office in January of 1986 he appointed defendant Stuart P. Jay to the position of director of finance and budget for the city.

Mr. Jay, described in a 1983 magazine article as "one of Louisville's young millionaires," is said to have been chairman of RETS Electronic Institute until he sold it in 1985. He apparently decided to donate his services to the city—a decision that may or may not have been influenced by the fact that his home was located several hundred feet outside the city limits and he thus failed to meet a statutory residency requirement. The residency issue came to public attention in 1992, and Mr. Jay then relinquished the director of finance position to become a special assistant to the mayor.

At the time of his appointment as director of finance, Mr. Jay was on record as having disputed the efficacy of covered call option writing. (The complaint describes him as "a long-time opponent of this investment strategy....") The director of finance is a member of the police pension fund board of trustees *ex officio*, and from the inception of his service on the board Mr. Jay attempted—unsuccessfully, as it turned out—to have Mr. Cullinan fired as one of the fund's money managers. Jay was joined in this effort by defendant Earl Mac Unger, a city employee who was likewise an *ex officio* member of the board of trustees. Jay and Unger were critical of the brokerage commissions paid by the fund on transactions involving assets managed by Cullinan, and Jay had his own investment strategies that he wanted the pension fund to follow.

The city was facing serious financial problems when the Abramson administration took office in 1986, and one of the ways in which the new mayor hoped to ease these problems was by having active members of the public safety forces transferred to the County Employee Retirement System. With the city's support, legislation making such transfers possible was enacted by the Kentucky General Assembly in April of 1986. The legislation provided, among other things, that

"If policemen of [a] city of the first class [having a police officers' pension system] elect entry into the County Employees Retirement System and thereby create excess funds [in the municipal pension system] ... these excess funds shall be distributed to the city for use by the city for any other purpose it may elect...." KRS 95.290(3).

Louisville police officers who were on active status in 1986 could elect to transfer to the county retirement system, as we understand it, and police officers hired in the future were to be placed in the county system automatically. In July of 1986 the city calculated that nearly $4 million (out of approximately $84 million in the police officers' pension fund prior to the split-up of the fund) had become "excess" as a result of transfers to the county retirement system. Pursuant to an agreement negotiated with the collective bargaining representative of the police officers, the plaintiffs' complaint avers, $3,955,540 was withdrawn from the police pension fund for uses agreed to by the city and the bargaining representative.[4]

## C. Prior Litigation

Mr. Cullinan repeatedly voiced opposition to any withdrawal of excess funds from the police pension fund, and he urged the board of trustees to contest the withdrawal. The board did so. In October of 1989, after attempts to negotiate a settlement had proved unsuccessful, the police pension fund filed a lawsuit against the city in a Kentucky state court. Alleging that the 1986 amendments to KRS 95.290 were unconstitutional and that the city's withdrawal of funds was illegal, the complaint sought the return of approximately $3.4 million.

The city retained outside legal counsel for the defense of the lawsuit, entering into a

---

4. The complaint also contains an oblique reference to the withdrawal from the firefighters' pension fund of "excess funds" in an amount of approximately $20 million.

professional service agreement with defendant Greenebaum, Treitz, Brown & Marshall ("GTB & M"), as the firm subsequently came to be known. Defendant William C. Boone, Jr., a partner of the defendant law firm at the time the pension fund filed its suit, was initially the lead attorney for the city. Defendant Samuel D. Hinkle, another GTB & M partner, subsequently replaced Boone as lead attorney. Defendant Culver W. Halliday, a GTB & M employee, also worked on the litigation.

In April of 1990 attorney Boone informed counsel for the pension fund, in writing, that the city planned to file a state court action against the fund's five elected trustees and others (including Stock Yards Bank, Mr. Cullinan and Cullinan Associates) for "breach of fiduciary duty in employing the so-called 'covered call option trading strategy' resulting in excessive trading and improper mix of investments, excessive transactions, excess fees and commissions and reporting of incorrect value of Fund Assets." Counsel for the city further stated that the proposed complaint would not be filed if the pending "excess funds" litigation were dismissed with prejudice and if the pension fund's board of trustees met a number of other conditions. Among the conditions proposed were these: that Stock Yards Bank, Cullinan Associates, R. Keith Cullinan, and certain named stockbrokers would be barred from doing business with the police pension fund for 20 years; that the board of trustees would conduct competitive bidding for investment services under procedures to be approved by the city's director of finance; that no more than one-third of the fund's assets would be placed with a single investment manager; and that no more than 45 percent of the assets would be invested in stocks without approval of the director of finance.

The pension fund declined to accept these terms, and the city promptly filed the threatened lawsuit. The state trial court dismissed the suit on the ground that the city lacked standing to sue. The Supreme Court of Kentucky reversed the dismissal, however, and ordered the suit reinstated. The Supreme Court pointed out that the city was required to "guarantee payment of pension benefits in the event of a shortfall of investment income and member contributions," and the Court went on to observe that "[n]ot only has [the city] made direct payments to the fund to maintain its fiscal soundness, it also has the additional duty, in the interest of sound public policy, to guarantee that active police officers have a dependable pension plan, one free of waste and mismanagement." *Louisville v. Stock Yards Bank & Trust Co.,* 843 S.W.2d 327, 328–29 (Ky.1992).

A few months after the Supreme Court ordered reinstatement of the city's lawsuit, Stock Yards Bank entered into a settlement agreement under which the bank was to pay the city $175,000 in return for the dismissal of both the city's suit and a substantially identical suit brought by defendant John H. Nevin. (Mr. Nevin, a city employee who was a pension plan beneficiary, had been asked to bring the suit after the city's action had been dismissed for lack of standing; Nevin's counsel of record was defendant Christina Heavrin, the law director of the city.)

Mr. Cullinan knew nothing of the settlement agreement until after it had been signed. His counsel subsequently asked the city's counsel not to have the claims against Cullinan and his firm dismissed, but this request was ignored. Orders dismissing with prejudice all claims against Mr. Cullinan and Cullinan Associates were tendered by the city and entered by the state court. Mr. Cullinan and his company paid nothing toward the settlement, and they have consistently maintained that the claims against them were baseless.

## II.

The present lawsuit was commenced in federal district court in March of 1994. The citizenship of the parties is not diverse, but the plaintiffs invoked the court's federal question jurisdiction by asserting claims for relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.,* and the Ku Klux Klan Act of 1871, now codified at 42 U.S.C. § 1983.

Section 1983 provides for civil liability on the part of any person who, under color of state law, subjects any U.S. citizen or other

person within this country's jurisdiction to a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States. Mr. Cullinan and his company asserted that they were the victims of retaliation because of their publicly stated opposition to the city's withdrawal of excess funds from the police pension system.[5] The defendants, they said, thus deprived them of free speech rights secured by the First Amendment. The plaintiffs further alleged that the defendants interfered with their Fourteenth Amendment right not to be deprived of property without due process of law.

The RICO statute creates a treble-damages remedy for any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962. Section 1962 provides, among other things, that funds derived from a pattern of racketeering activity may not be used or invested in the acquisition or operation of any enterprise engaged in or affecting interstate commerce; that no person may acquire or maintain any interest in or control of an enterprise engaged in or affecting interstate commerce if the acquisition or maintenance of such interest or control is accomplished through a pattern of racketeering activity; that no person employed by or associated with an enterprise engaged in or affecting interstate commerce may conduct or participate in the affairs of such enterprise through a pattern of racketeering activity; and that no person may conspire to violate any of the above prohibitions. Each of the defendants except the city was accused by Cullinan and Cullinan Associates of violating one or more of these RICO provisions. We shall spare the reader the details of the plaintiffs' theories in this regard.

In addition to asserting claims under RICO and § 1983, the plaintiffs asserted pendent state law claims for wrongful use of civil proceedings; abuse of process; interference with prospective and actual contractual relationships; punitive damages under KRS 411.182; and outrageous conduct causing severe emotional distress to Mr. Cullinan. The plaintiffs further sought to hold the city liable as an indemnitor for damages awarded against other defendants; to hold defendants Jay, Unger and Heavrin liable for violations of miscellaneous state statutes; and to hold Mayor Abramson and the City of Louisville liable for defamation. The plaintiffs' damages were alleged to be in excess of $10 million.

In due course the defendants moved, individually or in groups, for dismissal of the complaint. The grounds on which the defendants relied included both absolute immunity and qualified immunity. After the issues had been thoroughly briefed by the parties, the district court entered an order dismissing certain portions of the RICO and defamation claims, all of the indemnity and outrageous conduct claims, portions of the claims for interference with contractual relationships, and the abuse of process and § 1983 claims asserted against defendant Boone. In all other respects the motions to dismiss were denied.

The district court did not rule out the possibility that some or all of the defendants might be entitled to qualified immunity. Observing that "[d]ismissal on the basis of qualified immunity is typically granted at the summary judgment level," however, the court concluded that "the status [of] and actions taken by each defendant need further fleshing out."

Pursuant to the collateral order doctrine of *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), all of the defendants except the City of Louisville took interlocutory appeals from the denial of immunity. *Cf. Nixon v. Fitzgerald*, 457 U.S. 731, 742, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982) (citing cases in which the right to an immediate appeal of orders denying immunity has been recognized).

### III.

#### A. Absolute Immunity from Suit on Federal Claims

█ Judges and prosecutors have long been held to be absolutely immune from

---

5. The complaint also alleged that the defendants' objectives, in addition to giving the city more control over the selection of investment managers and investment strategies for the police pension fund, included the forestalling of a prospective suit against the city to recover the $20 million in excess funds taken from the firefighters' pension fund.

being sued on account of their judicial or prosecutorial acts. See *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).[6] Section 1983 was not intended to abolish this immunity (see *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)), and we have been given no reason to suppose that RICO was intended to abolish it either. It would be anomalous, we think, if officials who are immune from suit for alleged violations of the Constitution itself should be denied immunity from suit for alleged violations of a statute that does not incorporate the Constitution—particularly a statute as amorphous as RICO. See *Linne v. Rideoutte*, 971 F.2d 766 (D.C.Cir.1992), *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993), where the enactment of RICO was held not to have abrogated the immunities by which government officials and witnesses are protected from civil damage claims. To the same effect see *Thillens, Inc. v. Community Currency Exch. Ass'n of Illinois, Inc.*, 729 F.2d 1128 (7th Cir.), *cert. dismissed*, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 342 (1984), a case involving state legislators.

■ Executive branch officials other than prosecutors may be entitled to absolute immunity from suit for acts that are functionally equivalent to the acts of prosecutors or judges. See *Butz*, 438 U.S. at 511–12, 98 S.Ct. at 2913–14 (agriculture department chief hearing officer, judicial officer, and agency attorney conducting administrative trial may be entitled to absolute immunity for acts connected with administrative pro-

ceedings brought against a vocal critic of the department); *Watts v. Burkhart*, 978 F.2d 269 (6th Cir.1992) (en banc) (members of state medical licensing board held entitled to absolute immunity from suit under § 1983 for damages resulting from revocation of a physician's license to practice medicine); *Spear v. Town of West Hartford*, 954 F.2d 63 (2d Cir.), *cert. denied*, 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992) (town manager and corporation counsel held entitled to absolute immunity for authorizing a civil lawsuit by the municipality against a newspaper editor and a publisher who had been critical of the municipal police department).

■ Absolute immunity is not the norm, however. For executive branch officials in both state government (see *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974)) and federal government (see *Butz*, 438 U.S. at 507, 98 S.Ct. at 2911), the form of immunity once known as "good faith" immunity and now called "qualified" immunity is generally deemed sufficient to vindicate the important public interest in allowing government officials to do their work without undue fear of being haled into court for perceived missteps.[7] *Butz* held that "in a suit for damages arising from unconstitutional action ... executive officials exercising discretion are entitled only to the qualified immunity specified in *Scheuer*, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." 438 U.S. at 507, 98 S.Ct. at 2911 (footnote omitted). "[O]fficials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy re-

6. Such immunity also extends to legislators and their aides when performing acts of a legislative nature, see *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), and to witnesses testifying in court, see *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

7. A classic justification for immunity from suit on claims arising out of an official's performance of official duties was offered by Judge Learned Hand in *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950):

"The justification ... is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith."

quires an exemption of that scope." *Id.* at 506, 98 S.Ct. at 2911.

The defendants in the case at bar argue vigorously that they are entitled to absolute immunity with respect to the alleged violations of the plaintiffs' civil rights, the activities in question being functionally equivalent to quasi-judicial activities for which absolute immunity has been held to be available. We conclude that the defendants are entitled to qualified immunity in any event, however, and we shall pretermit the question of their entitlement to absolute immunity.

## B. Qualified Immunity from Suit on Federal Claims

The *fons et origo* of contemporary learning on qualified immunity is *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Recognizing the "substantial costs" attendant upon litigation over the subjective good faith of government officials, *id.* at 816, 102 S.Ct. at 2737, the Supreme Court held in *Harlow* that entitlement to qualified immunity must be determined instead on a basis of objective legal reasonableness:

> "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a *reasonable person* would have known." *Id.* at 818, 102 S.Ct. at 2738 (emphasis supplied).

■ The statutory or constitutional rights in question must have been "so clearly established when the acts were committed that *any* officer in the defendant's position, *measured objectively,* would have *clearly* understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir. 1987) (emphasis supplied) (citing *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "This 'objective reasonableness' standard focuses on whether defendants reasonably *could* have thought that their actions were consistent with the rights that plaintiff claims have been violated." *Walton v. City of Southfield,* 995 F.2d 1331, 1336 (6th Cir.1993) (emphasis supplied) (citations omitted).

■ In the case at bar the district court concluded that the plaintiffs' complaint "sufficiently alleged that the defendants' acts were not in good faith, and in violation of clearly recognized constitutional rights." Memorandum Opinion at 21. As we have seen, however, an allegation of subjective lack of good faith cannot suffice to defeat qualified immunity. See also *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (allegation of malice will not alone defeat an official's claim to qualified immunity). Under *Harlow v. Fitzgerald,* the test is an objective one: whether a hypothetical official, standing in the defendant's shoes, would necessarily have understood that taking the steps challenged by the plaintiff would violate the plaintiff's clearly established constitutional or statutory rights.

It is true, of course, that the right of Mr. Cullinan and Cullinan Associates to freedom of speech was clearly established, just as their rights not to be deprived of property without due process and not to be victimized by patterns of racketeering activity were clearly established. But the operation of the "objective legal reasonableness" standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987).

> "For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*

■ "It is not determinative," in other words, "that the plaintiff has asserted the violation of a broadly stated general right." *Garvie v. Jackson,* 845 F.2d 647, 650 (6th Cir.1988).

"[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.,* quoting *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039 (citation omitted).

*Garvie,* as we had occasion to observe in *Guercio v. Brody,* 911 F.2d 1179, 1184 (6th Cir.1990), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991), "clearly counsels the application of a fact-specific, as opposed to abstract, approach to qualified immunity questions."

The complaint and affidavit filed by the plaintiffs in the case at bar were commendably fact-specific. We are not persuaded that the facts need further "fleshing out" via expensive discovery proceedings; it seems to us that the papers already before the court present a reasonably clear picture of who the defendants are and what they are supposed to have done.

The district court thought the record unclear as to which defendants were acting as public officials. But the plaintiffs' papers leave no room for doubt that defendant Abramson was acting as the duly elected mayor of the City of Louisville, an office he assumed in January of 1986. Defendant Jay was acting as the city's director of finance and budget, a post he occupied from 1986 to 1992. (It is undisputed that Jay was functioning both as the finance director and as an *ex officio* member of the police pension fund board of trustees—and what counts, in our view, is the function; whether Jay was legally entitled to hold the offices he occupied is immaterial.) Defendant Unger was likewise acting as a city employee and *ex officio* member of the pension fund board, and no question has been raised as to the legality of Unger's tenure. Defendants Heavrin and Nevin also were city employees, and the complaint adds that Nevin was a retired city police officer and a beneficiary of the pension fund. Defendant GTB & M was a law partnership retained to represent the city in its litigation with the pension fund and the elected trustees, while the GTB & M lawyers actively engaged in the litigation on the city's behalf, defendants Boone, Hinkle, and Halliday, were all acting as counsel for the city.

■ There is a legal question as to whether the "outside counsel" status of the GTB & M lawyers and their firm makes these defendants ineligible for qualified immunity. In *Duncan v. Peck,* 844 F.2d 1261 (6th Cir. 1988), a civil rights case brought by a shareholder against a private litigant who had secured a prejudgment attachment of the plaintiff's shares and who ultimately acquired title to the shares at a sheriff's sale, we held that private litigants are not eligible for immunity from suit under § 1983. We reached this conclusion because "private parties were [not] immune from suit at common law, and because the various rationales for good faith immunity are inapplicable to private parties...." *Id.* at 1264. Mr. Cullinan and his firm cite *Duncan* for the proposition that "a private individual faced with a § 1983 claim has no immunities."

This is an accurate proposition in most factual contexts, but not here. As the Supreme Court recently had occasion to note, it appears that the common law "*did* provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign." *Richardson v. McKnight,* —— U.S. ——, ——, 117 S.Ct. 2100, 2105, 138 L.Ed.2d 540 (1997) (citations omitted) (emphasis in original). As attorneys for the city, GTB & M *et al.* were clearly acting as the city's agents. The rationales for qualified immunity apply to these lawyers and their firm in about the same way they apply to defendant Heavrin, Louisville's sometime law director. We see no good reason to hold the city's in-house counsel eligible for qualified immunity and not the city's outside counsel.

Another factor that the district court may have seen as militating against an early grant of qualified immunity to the appellants in the case at bar is that "a suit against

[public officials] in their official capacity is actually a suit against the governmental entity," whereas "[c]laims against a public official in his or her individual capacity seek to impose personal liability for actions taken under color of state law." Memorandum Opinion at 312. The court appears to have entertained doubts as to the capacity in which some or all of the appellants had been sued.

The plaintiffs' brief on appeal makes it clear that these "[d]efendants have been sued in their individual capacities." If the complaint was ambiguous on this point, it makes no difference for present purposes; an individual is not entitled to qualified immunity against an official-capacity claim, to be sure, but neither can he be held personally liable for damages on such a claim. The viability of the plaintiffs' lawsuit against the city itself is not at issue in the present appeal. All we are concerned with here is the question whether the appellants are entitled to qualified immunity from suit for damages insofar as liability is sought to be imposed on them in their individual capacities.

The defendants' entitlement to qualified immunity on the federal claims turns, as we have said, on the answer to the question whether reasonable officials/lawyers standing in the defendants' shoes would necessarily have known that in attempting to oust Cullinan as an investment manager for the Louisville police pension fund, and in bringing a retaliatory lawsuit which we must assume the city could not have won had the case gone to trial, they were violating Cullinan's rights under federal law. This question may not be answered in favor of the plaintiffs, of course, unless the federal rights claimed to have been violated were "clearly established" in the particularized sense required under the caselaw cited above.

Ordinarily, at least, in determining whether a right is "clearly established" this court will not look beyond Supreme Court and Sixth Circuit precedent. *Walton,* 995

F.2d at 1336. The district court cited two precedents—both Supreme Court cases—in support of the proposition that the rights allegedly violated by the defendants here were "clearly established." We turn to these precedents now.

The first decision, *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), involved a state court judgment against a number of black citizens of Claiborne County, Mississippi, who during the 1960s had tried to enforce demands for racial equality and integration by participating in a boycott of white merchants. The Supreme Court of Mississippi had upheld the judgment insofar as it rested on a finding of liability for malicious interference with the merchants' businesses. The United States Supreme Court reversed on First Amendment grounds, noting that the black citizens had "withheld their patronage from the white establishment of Claiborne County to challenge a political and economic system that had denied them the basic rights of dignity and equality that this country had fought a Civil War to secure." *Id.* at 918, 102 S.Ct. at 3428.

In the case at bar the district court relied on *Claiborne Hardware* to show that "[a] First Amendment right to speak freely on matters of public concern is well established." Memorandum Opinion at 22. As an abstract proposition, this is obviously true. When we reach the level of generality at which we are required to focus our analysis here, however, it is far from obvious to us that reasonable people standing in the shoes of the mayor of Louisville and his associates would have read *Claiborne Hardware* as establishing that the First Amendment (a) forecloses efforts to replace a pension plan money manager whose investment strategies run counter to those favored by the finance director of the city whose police officers are the beneficiaries of the plan, and (b) immunizes the money manager from retaliatory litigation.[8]

---

8. There is no consensus among the circuits as to whether a claim of malicious prosecution can support a § 1983 action. See *Braley v. City of Pontiac,* 906 F.2d 220, 226 and n. 6 (6th Cir. 1990): Our court has recognized a cause of

action under § 1983 for the false arrest and malicious criminal prosecution of a homeowner who resisted an unconstitutional search of his home by the police, see *Dunn v. State of Tennessee,* 697 F.2d 121 (6th Cir.1982), *cert. denied,* 460

*Greene v. McElroy*, 360 .U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the other decision cited by the district court, involved the discharge of an aeronautical engineer by a military contractor after the Department of Defense revoked the man's security clearance without having given him an opportunity to confront his accusers. The dispositive issue in the case, as the Supreme Court saw it, is one that has no relevance here:

> "The issue, as we see it, is whether the Department of Defense has been authorized to create an industrial security clearance program under which affected persons may lose their jobs and may be restrained in following their chosen professions on the basis of fact determinations concerning their fitness for clearance made in proceedings in which they are denied the traditional procedural safeguards of confrontation and cross-examination." *Id.* at 493, 79 S.Ct. at 1412.

Citing earlier authority, the *Greene* Court did note that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment...." *Id.* at 492, 79 S.Ct. at 1411. It is entirely correct to say, as the district court said here, that "the Supreme Court has recognized the right to be free from unreasonable actions by government officials which interfere with property interests." Memorandum Opinion at 22. But it is not correct, in our view, to conclude that Mr. Cullinan had a "clearly established" constitutional right not to be included as a defendant in the city's suit against the elected pension fund trustees. Neither is it correct to conclude that Messrs. Jay and Unger, the trustees who served on the pension fund board *ex officio*, were constitutionally barred from trying to persuade their fellow trustees to fire a money manager whose covered call option writing strategy was considered, rightly or wrongly, to be ill-advised.

As far as the plaintiffs' RICO claim is concerned, it would unduly prolong an opin-

ion that may already have tested the acceptable limits of prolixity if we were to explore in depth the arguments on which that claim rests. The arguments are ingenious, but we know of no Supreme Court or Sixth Circuit precedent that could properly be said to have informed the defendants that they could not do what they stand accused of doing without violating "clearly established" rights conferred on the plaintiffs by the RICO statute. As far as we are concerned, this ends the matter.

### C. Immunity from Suit on State Claims

Whether, and to what extent, the defendants are immune from suit on the plaintiffs' pendent state law claims is a question that turns on state law, as does the appealability of the denial of immunity on the state law claims. See *Marrical v. Detroit News, Inc.*, 805 F.2d 169 (6th Cir.1986); *Walton*, 995 F.2d at 1343.

We find it unnecessary, at this stage, either to review the merits of the district court's initial rulings on the state law immunity claims or to determine the appealability of those rulings. In light of our conclusion that the federal claims must be dismissed in their entirety, the district court may wish to exercise its discretion to dismiss the state law claims without prejudice. Alternatively, the district court may wish to revisit the substance of its initial rulings in light of our decision on the defendants' right to immunity from suit on the federal claims. (Although our decision is in no way binding insofar as the state law claims are concerned, state courts not infrequently look to federal law for guidance with respect to issues of state law.) The posture of the case now having undergone a rather considerable change, we think it appropriate to leave the next step to the sound discretion of the district court.

### IV.

The order appealed from is **REVERSED** insofar as it denied the appellants' motions for dismissal of the federal claims on quali-

---

U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983), but, like *Claiborne County*, this seems

rather remote from the present case.

fied immunity grounds, and the case is **RE-MANDED** for further proceedings not inconsistent with this opinion.