*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATHANIEL REVIS,

               *Plaintiff-Appellant,*

      *v.*

APRIL C. MELDRUM, KATHERINE A. YOUNG, DALE J.
MONTPELIER, TRACI A. WALDO, LASCHINSKI T.
EMERSON, JOYCE GRAVES, LARRY EATON, ROANE
COUNTY, TENNESSEE, and ANDERSON COUNTY,
TENNESSEE,

               *Defendants-Appellees.*

Nos. 06-5197/5399

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 04-00532—R. Leon Jordan, District Judge.

Argued: January 31, 2007

Decided and Filed: April 19, 2007

Before: GILMAN and SUTTON, Circuit Judges; TARNOW, District Judge.[*]

---

## COUNSEL

**ARGUED:** Stephen G. Anderson, BAKER, DONELSON, BEARMAN & CALDWELL, Knoxville,
Tennessee, for Appellant. Linda J. Hamilton Mowles, LEWIS, KING, KRIEG & WALDROP,
Knoxville, Tennessee, W. Mitchell Cramer, NORTON & LUHN, Knoxville, Tennessee, Kristen B.
Amonette, DODSON, PARKER & BEHM, Nashville, Tennessee, Frank Q. Vettori, O'NEIL,
PARKER & WILLIAMSON, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Stephen G.
Anderson, Andrew L. Colocotronis, BAKER, DONELSON, BEARMAN & CALDWELL,
Knoxville, Tennessee, for Appellant. Linda J. Hamilton Mowles, LEWIS, KING, KRIEG &
WALDROP, Knoxville, Tennessee, W. Mitchell Cramer, NORTON & LUHN, Knoxville,
Tennessee, Donald Capparella, DODSON, PARKER & BEHM, Nashville, Tennessee, Frank Q.
Vettori, O'NEIL, PARKER & WILLIAMSON, Knoxville, Tennessee, for Appellees.

---

[*]The Honorable Arthur J. Tarnow , United States District Judge for the Eastern District of Michigan, sitting by
designation.

1

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  Laschinski T. Emerson obtained a money judgment in a sexual-harassment lawsuit from a Tennessee trial court against her former employer Nathaniel Revis and his company, Oak Ridge Research, Inc. (ORRI).  Revis appealed, but failed to post an appeal bond.  Emerson subsequently sought and obtained two writs of execution for Revis's real and personal property in Roane County, Tennessee to satisfy the judgment.  Roane County Deputy Sheriff Larry Eaton, accompanied by Tracy Waldo, a paralegal from the law firm representing Emerson, appeared at Revis's house to serve the writs.  Under Eaton's direction, private contractors seized Revis's personal property and changed the locks on his residence.  Deputy Eaton also ordered Revis to leave the residence and inquired about any cash that Revis was carrying on his person.

Revis filed suit pursuant to 42 U.S.C. § 1983 against the persons and entities involved in executing the writs, alleging that the seizure of his residence and the search of his person pursuant to the writs violated his constitutional rights.  The district court granted summary judgment to some of the defendants, dismissed all claims against the rest, and further ordered Revis to pay the private-party defendants' costs of litigation.  For the reasons set forth below, we **AFFIRM** in part, **VACATE** in part, and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

**A.      Factual background**

Emerson filed a lawsuit in the Circuit Court of Anderson County, Tennessee against Revis and ORRI, alleging sexual harassment, assault and battery, and retaliatory discharge.  The law firm of Montpelier & Young, along with solo practitioner April Meldrum, represented Emerson.  A jury awarded Emerson $175,800 in actual damages, including $18,000 from Revis himself and $157,800 from ORRI, in addition to $500,000 in punitive damages.  Judgment was entered in November of 2003, but an amended judgment was filed in August of 2004 that remitted the punitive damage award to $150,000, but also added $282,964.50 in attorney fees and $12,000 in discretionary costs.  The total amended award amounted to $620,764.50.

Revis and ORRI were held jointly and severally liable for the punitive damages, the attorney fees, and the costs, meaning that Revis was personally liable for a maximum of $462,964.50.  The amended judgment also specified that 10% interest would accrue on the judgment beginning on July 22, 2003, the date that the jury verdict was announced.  Furthermore, the amended judgment stated that "execution may issue" unless Revis filed an appeal bond within 30 days from the date of entry.

After filing postjudgment discovery requests in August of 2004 that sought financial information from Revis, Emerson lodged two applications for writs of execution with the Anderson County Circuit Court on October 8, 2004.  The applications sought permission to sell both real and personal property owned by Revis in Roane County, Tennessee.  Because Revis had not yet posted an appeal bond, Anderson County Deputy Court Clerk Joyce Graves promptly issued the writs.  Both writs were addressed "to any lawful officer to execute and return."  The writs provided, in pertinent part, as follows:

> You are hereby commanded to take from the property of Nathaniel Revis including in [sic] property listed below the sum of $678,807.32 . . . to satisfy the judgment obtained by the plaintiffs . . . .  You are further commanded to pay such monies,

when collected, into the Court and you shall make return as to how you have executed this writ within the time allowed by law.

Both writs thus overstated Revis's actual judgment debt by roughly $200,000, though this misstatement has little bearing on the issues before us. Under the "description of property," the first writ listed "Residence located at [Revis's home address]." The second writ described "all personal property (and asset [sic] including furnishings, automobiles, cash, etc.) located on the premises of [Revis's home address]." Both writs were delivered to the Sheriff's Department in Roane County.

Deputy Larry Eaton received the writs and reviewed them. Unsure how to proceed, he took them to the Roane County Attorney for review. Eaton stated in his affidavit that the County Attorney advised him that the writs were valid court orders and were "to be obeyed as stated on their faces." Eaton did not ask—and the County Attorney apparently offered no advice—about whether actual seizure of the residence was appropriate or necessary. Revis has moved on appeal to submit deposition testimony on this issue given by Eaton in a parallel state-court proceeding, but this testimony does no more than confirm the facts as described and therefore need not be considered.

At 6:25 a.m. on October 18, 2004, Deputy Eaton served the writs on Revis at Revis's residence. Several other Sheriff's Department employees accompanied Eaton, as did Waldo on behalf of Montpelier & Young. After Eaton notified Revis of the writs, several employees of a private moving company hired by Montpelier & Young began packing Revis's personal property and moving it to a storage facility. This included removing allegedly valuable "artwork and furnishings."

Revis claims that, in addition to removing his personal property, Deputy Eaton caused the locks to be changed at his residence. According to Revis, K & K Lock and Key changed the outside locks on Revis's home pursuant to a contract arranged for by Montpelier & Young and approved in writing by Waldo. At least one set of the new keys was given to Eaton. According to Revis, Eaton escorted him out of the residence at 10:00 p.m. that night and advised Revis that he could not return.

Finally, Revis claims that he was unconstitutionally searched by Eaton. Waldo allegedly requested, at some point during the execution, that Eaton check to determine whether Revis was removing cash from the premises. Revis stated in his affidavit that Eaton "demanded that I submit to a search of my person" and that Revis "complied under duress." He added that Eaton "was armed" and "made it apparent that force would be used if I resisted." Eaton explained in his affidavit that he simply asked Revis if he had any cash on him, and that Revis responded by showing him his wallet, which contained three dollars. Both parties agree that no money was taken from Revis during this interaction.

Revis posted an appeal bond seven days later. At that point, all of his property, both real and personal, was returned to him.

## B.     Procedural background

As noted above, Emerson had prevailed against Revis in her sexual-harassment lawsuit in Tennessee state court. Revis's current lawsuit stems from the actions taken to collect the judgment obtained in that litigation. Revis filed this action in federal district court in November of 2004, claiming violations of his civil rights pursuant to 42 U.S.C. §§ 1983 and 1985(3). "Section 1983 provides a federal cause of action for civil damages against an individual acting under color of state law who deprives another of rights, privileges, or immunities secured by the Constitution and laws." *Jones v. Reynolds*, 438 F.3d 685, 689 (6th Cir. 2006) (quotation marks omitted). A § 1985(3) claim, on the other hand, is based upon "private conspiracies that are aimed at invidiously discriminatory deprivation of the equal enjoyment of rights secured to all by law." *Taylor v. Brighton Corp.*, 616

F.2d 256, 264 (6th Cir. 1980). Revis also asserted eight claims under Tennessee state law arising from the same events. As private-party defendants, the complaint named Emerson, her attorneys in the underlying state-court action, and paralegal Waldo. Roane County, Anderson County, Deputy Eaton, and Deputy Clerk Graves were named as County defendants.

During the course of the ensuing litigation, all of the defendants other than Anderson County and Deputy Clerk Graves moved for either summary judgment or dismissal, and Revis responded by moving for partial summary judgment against Eaton and Roane County and by opposing the other defendants' motions. Two orders that disposed of the various motions were ultimately issued by the district court. The first granted the private-party defendants' motions to dismiss Revis's federal claims. Revis's § 1983 claim against them was dismissed because the complaint failed to show that the private-party defendants' actions were fairly attributable to the state, and his § 1985(3) claim was dismissed because the asserted equal protection violation was insufficiently alleged. The second order granted Deputy Eaton's and Roane County's motions for summary judgment on the same federal claims. Dismissal of these two County defendants was based on the court's determination that no constitutional violation had occurred and, alternatively, that Eaton was entitled to qualified immunity.

Having disposed of the federal claims against the above defendants, the district court declined to exercise supplemental jurisdiction over Revis's related state-law claims. The court ultimately dismissed the remaining claims in the case against Anderson County and Deputy Clerk Graves after issuing an order for Revis to show cause why they should not be dismissed.

Thereafter, the private-party defendants moved for an award of attorney fees pursuant to 42 U.S.C. § 1988, seeking $86,911.47 in fees. Section 1988 gives the district court discretion to award reasonable costs and attorney fees to the prevailing parties in a civil rights action. In the case of prevailing defendants, the court may award fees where "the plaintiff's action was frivolous, unreasonable, or without foundation." *Wilson-Simmons v. Lake County Sheriff's Dep't*, 207 F.3d 818, 823 (6th Cir. 2000) (citation and quotation marks omitted). Finding Revis's claims against the private-party defendants to be "without foundation and vexatious," the district court granted the private-party defendants' motion, but awarded them only 75% of their original request, which it calculated to be $65,183.61. The court determined that 25% of the work for which fees were requested related to defending against Revis's state-law claims, work that was noncompensable under § 1988.

Revis filed a timely notice of appeal. His challenges on appeal are limited to the district court's grant of summary judgment in favor of Deputy Eaton and Roane County on the § 1983 claim, its dismissal of the § 1983 claim against the private-party defendants, and its award of attorney fees to the latter group.

## II. ANALYSIS

### A.    Standard of review and legal framework

The analysis of each issue raised by Revis involves a different standard of review. These standards are set forth below.

#### 1.    *Summary judgment and qualified immunity*

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).

Evaluation of the claim against Deputy Eaton also entails an analysis of the doctrine of qualified immunity. That doctrine serves to protect government officials who perform discretionary functions from both suit and liability, provided that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The analysis of qualified immunity generally proceeds through a two-step inquiry. First, the court must determine "whether the plaintiff in the civil action has demonstrated the violation of a constitutionally protected right." *Charvat v. E. Oh. Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001). Second, the court must determine "whether the right is so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Id*. (citation and quotation marks omitted). A third consideration that is occasionally examined by this court to "increase the clarity" of the analysis is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005) (citations omitted).

### 2.       *Dismissal under Rule 12(b)(6)*

We review de novo a district court's dismissal of a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996). A motion to dismiss may be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id*. (citation omitted).

### 3.       *Award of attorney fees under 42 U.S.C. § 1988*

The grant or denial of attorney fees by a district court is reviewed under the "abuse of discretion" standard. *Berger v. City of Mayfield Heights*, 265 F.3d 399, 402 (6th Cir. 2001). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Id*. (citation omitted).

## B.       The § 1983 claim against Deputy Eaton

Although the district court granted summary judgment in favor of Deputy Eaton as to all of Revis's claims, Revis appeals the court's judgment only with respect to his § 1983 claim. According to Revis, the court erred in determining that Eaton was entitled to qualified immunity regarding Eaton's eviction of Revis from his residence and the alleged search of his person. Revis argues that the eviction violated his Fourth and Fourteenth Amendment rights and that the search of his person violated his Fourth Amendment rights. He concedes that his personal property was constitutionally seized in executing the writs; he contests only his eviction and the search of his person.

The State's exercise of physical control over a residence that results in eviction can implicate both Fourth and Fourteenth Amendment protections. *See, e.g.*, *Soldal v. Cook County*, 506 U.S. 56, 72 (1992) (holding that the physical seizure of a trailer home by police prior to obtaining a lawful eviction order stated a claim for a Fourth Amendment violation); *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002) (concluding that the summary eviction of tenants by the police in contravention of established state eviction procedures supported a claim for a Fourteenth Amendment violation). For ease of analysis, we will consider Revis's two constitutional claims in reverse order.

### 1.       *Revis's Fourteenth Amendment claim*

Revis does not challenge the constitutionality of Tennessee's levy and execution procedures; rather, he alleges that Eaton did not properly follow them, and in so doing deprived Revis of his due process rights. The first step in the qualified-immunity analysis requires us to determine whether Revis's assertion in this regard is correct. *See Charvat*, 246 F.3d at 616.

### a.       *Due process generally requires notice and an opportunity to be heard prior to eviction*

Initially, we must consider whether the interest asserted by Revis is a protected liberty or property right under the Fourteenth Amendment. *See Thomas*, 304 F.3d at 576. Property interests are not created by the Constitution, instead "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* (citation and quotation marks omitted). Here, as the owner and occupant of his residence, Revis clearly had a valid possessory interest under Tennessee law.

Furthermore, in the specific context of eviction, the Fourteenth Amendment has particular import. This court has held that "[d]ue process generally requires notice and a hearing prior to eviction." *Thomas*, 304 F.3d 563. In *Thomas*, this court determined that the summary eviction of lawful tenants by the police in contravention of state eviction procedures violated the tenants' due process rights. *Id.* Deputy Eaton argues, however, that the judgment against Revis in the underlying litigation provided adequate notice and an opportunity to be heard in compliance with *Thomas*.

### b.       *The underlying litigation and judgment did not provide constitutionally adequate process for Revis's eviction*

The district court held that Revis's eviction pursuant to the writ of execution did not violate his right to due process because the judgment awarded against him in the underlying litigation was "an award of execution" upon which the state court could issue "writs of possession and execution." Because Deputy Eaton had a lawful writ of execution for Revis's residence, the district court reasoned, Eaton was entitled to take immediate possession of it. The court, however, cited no authority to support its determination, and the issue appears to be one of first impression in this circuit.

Revis correctly points out that the underlying sexual-harassment lawsuit established nothing beyond his financial obligation to Emerson. This materially distinguishes the judgment against Revis from a judgment for possession upon which a writ of possession may issue. The money judgment against Revis is silent concerning who is entitled to possess Revis's residence, and it provides no notice to Revis that he was subject to summary eviction. Rather, the judgment simply notified Revis that, unless he posted an appeal bond within 30 days, "execution may issue" to satisfy the judgment. In addressing a similar argument that the underlying merits hearing served as adequate notice for a postjudgment seizure, the Third Circuit expressed skepticism, noting that the "judgment represents only an adjudication of [the judgment debtor's] liability on a monetary debt, not a transfer to [the judgment creditor] of title to any particular item of [the judgment debtor's] property." *Finberg v. Sullivan*, 634 F.2d 50, 58 (3d Cir. 1980) (en banc).

Of course the underlying litigation also did not adjudicate the right to possess Revis's "artwork and furnishings" either, but Revis concedes that these items were constitutionally seized pursuant to the writ of execution. Eviction, however, has traditionally involved greater procedural safeguards than those related to less severe deprivations. An individual's immediate loss of possession of his or her home plainly has greater adverse consequences than the loss of artwork or even a portion of an individual's wages. *See, e.g., United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53-54 (1993) (noting that an individual's "right to maintain control over his home, and

to be free from governmental interference, is a private interest of historic and continuing importance," and that "the private interests at stake in the seizure of real property weigh heavily in the *Mathews* balance"). As the Supreme Court explained in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the due process analysis generally requires consideration of the private interest that will be affected, the risk of an erroneous deprivation compared with the probable value of additional procedural safeguards, and the government interest at stake.

An owner's strong possessory interest in his or her residence is just one of the *Mathews* due process balancing factors weighing against the constitutionality of summary eviction pursuant to a writ of execution. *See id.* The risk of an erroneous deprivation is also significant. First, although Revis has not argued that it applies here, Tennessee provides a homestead exemption, which has been interpreted to permit the owners to occupy their designated homesteads pending receipt of the exempted amount from the repossessing party. *See* Tenn. Const. art. XI, § 11; *In re Rolfes*, 307 B.R. 59, 64 (Bankr. E.D. Tenn. 2004) (citing nineteenth-century Tennessee caselaw for the proposition that the debtors were entitled to remain in possession of their residence pending their receipt of the homestead exemption). Summary eviction pursuant to a writ of execution clearly risks running afoul of that protection.

In addition, seizing a judgment debtor's residence and evicting him might serve no valid purpose of the judgment creditor where the debtor possesses no equity interest in the home with which to satisfy the judgment. Moreover, in the case of a judgment debtor who leases his residence to tenants, the underlying trial and judgment could not be said to satisfy the tenants' due process rights prior to their summary eviction. Additional predeprivation process, such as notice and an opportunity to be heard, would permit an owner or tenants to raise these concerns and thereby decrease the risk of an erroneous deprivation. Nor would employing long-established state eviction procedures unduly harm the competing interest of efficient postjudgment remedies. *Cf. Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 185 (6th Cir. 1984) (concluding that requiring hearing procedures for Section Eight housing residents whose leases were terminated would "not impose significant administrative burdens" because such hearing procedures were already in place for participants in other types of public housing arrangements).

We recognize that exigency concerns can justify the seizure of personal property without advance notice, but such concerns typically do not arise in connection with real estate. *See James Daniel Good Real Prop.*, 510 U.S. at 52-53 (holding that more procedures are required before seizing real estate, "which, by its very nature, can be neither moved nor concealed," than before seizing a yacht which is the "sort [of property] that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given.") While we can envision a scenario in which exigency concerns would justify the seizure of real estate without notice, such as where a structure is deemed unsound, the present case involves no such circumstances. *See Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir. 1994) (recognizing that exigency concerns regarding public safety can justify immediate eviction action under a limited set of circumstances).

Thus, while personal property may be levied upon through seizure, a writ of execution for real property is generally levied by formally noting on the writ a legal description of the property and giving notice to the owner and the public that the property is subject to sale. *See, e.g.*, *Hammock v. Qualls*, 201 S.W. 517, 518 (Tenn. 1918) ("The levy of an execution upon real estate does not transfer the title to the land nor create any interest thereto in the sheriff."); *Crustinger v. Catron*, 29 Tenn. 24, 27-28 (Tenn. 1848) ("[T]he levy of an execution upon land does not divest the seizin of the owner, the defendant; no title or interest thereto, is vested in the sheriff by the levy, he is the mere agent under the law to sell . . . ."). As the trial court judge presiding over Revis's parallel Tennessee state-court proceedings concerning these events observed, "the law is you don't levy an execution on realty by dispossessing the owner." *See also Newberry v. Davison Chem. Co.*, 65 F.2d 724, 727 (4th Cir. 1933) (determining under North Carolina law that "execution gives no possession

or right of possession of real estate . . . . [A] docketed judgment constitutes a lien which may be enforced by sale under execution, but until such sale is made and deed pursuant thereto executed, the right of possession in the owner is not affected."); 30 Am. Jur. 2d *Executions* § 185 ("Thus, in the case of real property, a writ of execution functions as an instruction to the sheriff to go to the property in question and inform its inhabitants that it will be sold to satisfy a judgment owed; until the property is actually sold, the landowner's interest in the property does not change.").

These authorities support the principle that an execution levied upon real estate does not result in the immediate eviction of the judgment debtor. As a Pennsylvania state-court judge explained in analyzing that state's execution procedures,

> the issuance of a writ of execution against the debtor's real estate does not work as an immediate seizure of the property. Before the creditor or sheriff's sale purchaser can take possession of the debtor's real estate, the debtor must voluntarily vacate the premises or eviction proceedings must be brought against the debtor. The debtor, by this time, has already been advised in writing repeatedly that he should contact a lawyer, that he may lose valuable property rights unless he acts promptly.

*Scott v. Adal Corp.*, 509 A.2d 1279, 1285 (Pa. Super. Ct. 1986). Although Deputy Eaton argues that Tennessee recently altered its procedure to depart from this established practice, we disagree for the reasons set forth below.

Eaton relies on *Endicott-Johnson Corp. v. Encyclopedia Press, Inc.*, 266 U.S. 285 (1924), for the proposition that no notice or hearing is required before effecting postjudgment remedies. In *Endicott-Johnson*, the Supreme Court considered a claim by a judgment debtor that he was entitled to additional predeprivation procedures prior to the garnishment of his wages. The Court held that

> the established rules of our system of jurisprudence do not require that a defendant who has been granted an opportunity to be heard and has had his day in court, should, after a judgment has been rendered against him, have a further notice and hearing before supplemental proceedings are taken to reach his property in satisfaction of the judgment. Thus, in the absence of a statutory requirement, it is not essential that he be given notice before the issuance of an execution against his tangible property; after the rendition of the judgment he must take notice of what will follow, no further notice being necessary to advance justice.

266 U.S. at 288 (citations and quotation marks omitted). *Endicott-Johnson*, however, concerned only the process due before a deprivation of wages through garnishment, not before deprivation of the special possessory interest that an owner or tenant has in his residence.

In *Agg v. Flanagan*, 855 F.2d 336, 343 (6th Cir. 1988), we followed *Endicott-Johnson* and upheld an Ohio child support postjudgment remedy against a due process challenge. 855 F.2d at 342. The Ohio procedure provided for an initial hearing that determined the amount of child support payments owed and concluded in a judgment in the form of a support order. *Id.* If payments were not made, the court could issue postjudgment wage assignments that authorized the garnishment of wages in the amount owed. *Id.* This court held that, under *Endicott-Johnson*, no predeprivation process was required before garnishment proceeded because the support-order judgment provided adequate notice that nonpayment would result in garnishment. *Id.* at 343.

But *Agg* dealt with materially different circumstances than those in the present case. First, like *Endicott-Johnson*, *Agg* addressed only garnishment, not eviction from one's home. Furthermore, the underlying hearing in *Agg* essentially determined the rights of the parties regarding the property levied upon—namely, the payor's wages. The underlying trial in the present case, by contrast, simply adjudicated a tort claim, not the right to possess Revis's residence.

In short, no authority cited by Deputy Eaton has permitted levying an execution upon a residence by evicting the owner without postjudgment notice and the opportunity to be heard. This lack of authority permitting Eaton's actions, combined with both the longstanding due process requirements of notice and the opportunity to be heard before eviction and the *Mathews* balancing considerations outlined above, lead us to conclude that Eaton violated Revis's Fourteenth Amendment rights. We reiterate this court's holding in *Thomas*, 304 F.3d at 580, that "postdeprivation remedies of any sort would be inadequate" to redress the unconstitutional eviction here in light of the "importance of Plaintiffs' interest in maintaining possessory rights to their place of residence." *Cf. Flatford*, 17 F.3d at 168-169 (6th Cir. 1994) (holding that "[f]undamental fairness expects more than mere tort remedies where [the] government dispossesses its citizens from their homes," but acknowledging that postdeprivation remedies may suffice under exigent circumstances).

### c.          *Eaton is entitled to qualified immunity for the violation*

Having determined that Deputy Eaton did in fact violate one of Revis's constitutional rights, we next evaluate "whether the right is so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Charvat*, 246 F.3d at 616 (citation and quotation marks omitted). In answering this question, we consider the right at issue "in light of the specific context of the case, not as a broad general proposition." *Lyons v. City of Xenia*, 417 F.3d 565, 571 (6th Cir. 2005) (citation and quotation marks omitted). Revis's right to notice and an opportunity to be heard prior to eviction following the issuance of a writ of execution for his residence is the particular right at issue here. Just as Eaton has set forth no judicial authority that clearly justifies the eviction he effected, neither has Revis cited any federal authority that squarely defines due process requirements in the context of the postjudgment deprivation of one's residence. The lack of settled jurisprudence in this area indicates that the right at issue cannot be said to be "so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Charvat*, 246 F.3d at 616.

Recent changes in Tennessee procedural law also support Deputy Eaton's qualified-immunity argument. Three months prior to the seizure at issue, Tennessee amended its law concerning executions on judgments by consolidating existing rules, statutory law, and caselaw into Rule 69 of the Tennessee Rules of Civil Procedure. The change lessened any textual distinction between the manner prescribed for levying executions against realty as opposed to personal property. Rule 69.06, titled "Execution on Personalty," states that a "levy is effective when the sheriff with a writ of execution exercises control over the judgment debtor's personalty." Similarly, Rule 69.07, titled "Executions on Realty," provides that "a levy occurs when the sheriff exercises control over the judgment debtor's realty." With regard to realty, however, the new rule requires 20-days' notice to the judgment debtor and all other persons having an interest of record in the realty prior to any sale. *Id*.

No Tennessee court has yet interpreted Rule 69 in the context of executions on realty. But historical Tennessee caselaw, combined with the commentary to the new rule stating that it was simply meant to "consolidate procedures" and "does not radically change current law," militate in favor of determining that Tennessee did not intend to begin permitting judgment creditors to summarily evict judgment debtors from their homes in the course of levying an execution. *See, e.g.*, *Crustinger*, 29 Tenn. at 27-28 (stating that simply levying an execution does not divest the landowner of seisin). Moreover, considering that Deputy Eaton has not cited any other state's procedural law permitting such a practice when levying upon real estate, his interpretation of Rule 69 would apparently make Tennessee's procedure unique in the nation.

The United States Supreme Court considered an analogous scenario in *James Daniel Good Real Property*, 510 U.S. at 53-54, where establishing in rem jurisdiction required a governmental "seizure," but the actual seizure of real property created due process problems. 510 U.S. at 57. The

Court held that, while personal property may be physically seized, "in the case of real property, the res may be brought within the reach of the court simply by posting notice on the property and leaving a copy of the process with the occupant." *Id*. at 58. Similarly, Tennessee's Rule 69.07 most likely was intended to do nothing more than direct the sheriff to give notice that the property was subject to sale and return the writ. Logic dictates that a rule requiring 20-days' notice prior to selling the debtor's realty necessarily contemplates notice prior to evicting the debtor from the realty. While the existence of exigent circumstances might permit exercising control through actual seizure, we have no need to address that issue in the present context.

The language of the writs themselves further supports Eaton's qualified immunity argument. Both writs given to Deputy Eaton, which he was required to execute under Tennessee law, ordered that he was "hereby commanded to take from the property of Nathaniel Revis including in property listed below" the sum of $670,807.32. Under "Description of property," the first writ listed "Residence located at" Revis's address. This operative language was identical to the wording in the second writ, except that under "Description of property," the second writ listed "all personal property . . . on the premises of" Revis's address.

Revis acknowledges that the second writ authorized the actual seizure of the property described, but argues that the first did not. This distinction, however, is far from obvious from the face of the writs. The County Attorney further advised Eaton that the writs were "to be obeyed as stated on their faces," but gave him no specific instructions regarding the residence. These facts distinguish this case from *Audio Odyssey, Ltd. v. Brenton First Nat. Bank*, 245 F.3d 721, 740 (8th Cir. 2001), *panel opinion reinstated en banc*, 286 F.3d 498 (8th Cir. 2002), where the Eighth Circuit denied qualified immunity to state actors involved in unconstitutionally seizing real property when executing a writ of replevin for personal property. The writ in *Audio Odyssey* addressed only personal property and no legal advice was sought. *Id*.

Here, the advice from the County Attorney, combined with the language of the writs themselves, the newly promulgated Rule 69 of the Tennessee Rules of Civil Procedure, and the absence of clearly established federal caselaw governing the postjudgment deprivation of real property, all support the proposition that Deputy Eaton's actions were not such that a reasonable officer would have understood that what he was doing violated Revis's rights. *See Charvat*, 246 F.3d at 616; *see also Scott v. Clay County*, 205 F.3d 867, 873-74 n.9 (6th Cir. 2000) ("[Qualified immunity] sweeps broadly, affording [state officials] ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (citation and quotation marks omitted). We therefore conclude that Eaton is entitled to qualified immunity with regard to Revis's Fourteenth Amendment claim.

Having concluded that Eaton acted under a reasonable misapprehension of the applicable law, we next address Revis's allegations that Eaton acted in bad faith and as part of a conspiracy to deprive Revis of his constitutional rights. We first note that subjective intent is ordinarily not relevant to the qualified immunity analysis. *See, e.g., Blake v. Wright*, 179 F.3d 1003, 1008 (6th Cir. 1999) (noting that the concept of qualified immunity "reflects an objective standard, making the official's subjective intent irrelevant."); *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990) ("In a section 1983 action claiming that [the] plaintiff was injured by state action as the result of a conspiracy which includes private persons, the defense is still available to the qualifiedly immune actor."), *abrogated on other grounds*, *Martin v. Thomas*, 973 F.2d 449, 455 (5th Cir. 1992).

Furthermore, although Revis's complaint alleges a "conspiracy" between Eaton and the private-party defendants, he asserts no facts either in his pleadings or affidavit that support the conclusion that Eaton formed a plan or objective to deprive Revis of his constitutional rights. The record instead reflects that Eaton acted according to his reasonable misunderstanding of what the writs of execution required him to do under Tennessee law. As noted above, Revis has moved to

enlarge the record on appeal to include Eaton's deposition testimony taken in the parallel state-court proceedings. We decline to do so, however, not only because Rule 10 of the Federal Rules of Appellate Procedure generally bars such a substantive expansion of the record, but because Eaton's testimony is on balance of no help to Revis and actually bolsters our conclusion that no conspiracy occurred. Revis's claim that Eaton knowingly violated Revis's rights or that he conspired with the private-party defendants to do so, therefore, lacks merit as a matter of law.

### 2.      Revis's Fourth Amendment claims

#### a.      The seizure of Revis's residence

Revis asserts, in addition to his due process claim, that his eviction violated the Fourth Amendment as an unreasonable seizure of his residence. In light of *Soldal*, 506 U.S. at 72, and *Thomas*, 304 F.3d at 576, Deputy Eaton's actions in physically taking possession of Revis's house by having the locks changed, retaining a key, and evicting Revis demonstrably effected a seizure within the meaning of the Fourth Amendment. *See Soldal*, 506 U.S. at 61 (holding that a seizure under the Fourth Amendment had occurred when police "unceremoniously dispossessed" a resident of his trailer home by authorizing its physical removal); *cf. Thomas,* 304 F.3d at 582 (questioning whether verbally ordering the tenants to leave and escorting them out was a seizure of the residence where the officers did not take physical possession of the property) (Gilman, J., writing for the court on this point separately from the lead opinion).

Deputy Eaton's reliance on dicta in *Soldal* is misplaced. There, the Court noted that "had the ejection in this case properly awaited the state court's judgment it is quite unlikely that the federal court would have bothered with a § 1983 claim alleging a Fourth Amendment violation." *Soldal*, 506 U.S. at 71. The "state court's judgment" that the Court advised waiting for in that case, however, referred to a judgment for possession pursuant to a state-court eviction proceeding pending at the time the trailer home was seized. *Id*. at 58. Thus, *Soldal* simply begs the question of whether the court's writ of execution in this case entitled Eaton to evict Revis.

In Part II.B.1. above, we answered that question in the negative and determined that, under Tennessee law, the writ of execution for Revis's residence commanded Deputy Eaton only to give notice that the property was subject to sale. Eaton's physical seizure of Revis's residence was therefore in violation of the Fourth Amendment. For the same reasons addressed in assessing Eaton's claim of qualified immunity under the Fourteenth Amendment, however, Eaton is entitled to qualified immunity for the reasonable mistake of law that occurred.

#### b.      Eaton's alleged search of Revis

Revis also raises a separate Fourth Amendment claim concerning the alleged unlawful search of his person that took place at some point during the course of the levy. Rather than describing the attendant facts, Revis's complaint and his affidavit on the subject contain only conclusory legal assertions. He states that Deputy Eaton "demanded that I submit to a search of my person" and that Revis "complied under duress" because Eaton was "armed and made it apparent that force would be used if I resisted."

While we are mindful that the summary judgment standard requires construing all facts and drawing all inferences in favor of Revis, the conclusory assertions in his complaint and affidavit set forth no specific facts concerning the alleged search. Deputy Eaton explains more fully that he "asked [Revis] if he had any money on him (at the request of the law firm representative who was present) and Revis pulled out his billfold, opened it and showed me that he had only $3.00 in it." Revis's pleadings and affidavit raise no factual dispute regarding this relatively innocuous account of the events. In fact, Revis's complaint similarly asserts that "Revis was obliged to empty his [own] pockets, revealing three dollars ($3.00), which he was allowed to keep."

The district court properly concluded that this verbal exchange did not amount to a search, and therefore did not violate Revis's Fourth Amendment rights. *See United States v. Oliver*, 363 F.3d 1061, 1067 (10th Cir. 2004) (determining that "protection against rude, officious, or intrusive police questioning is not a core concern of [the Fourth] Amendment. Questioning in itself does not constitute a search or seizure"). "[A]lthough a person detained on reasonable suspicion is not free to leave, a person questioned by an officer is free to refuse to answer the question." *Id.*

## C.      Roane County's alleged failure to properly train Deputy Eaton

In conjunction with Revis's constitutional claims against Deputy Eaton, he also asserted a claim against Roane County for failing to properly train Eaton. The district court dismissed this claim because it found that no constitutional violation had occurred. Although we disagree with the district court's rationale on this issue, we agree with the conclusion that it reached.

This court has held that "[o]nly when the failure to train amounts to 'deliberate indifference' on behalf of [the state entity] toward its inhabitants . . . will failure to train lead to [that entity's] liability under § 1983." *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006). Here, Revis has made no showing of any deliberate indifference in failing to train Deputy Eaton that resulted in the "highly predictable consequence" of a constitutional violation of the sort that occurred. *See id.* Eaton instead acted properly by seeking legal advice as to how to execute the writs. Unfortunately, Eaton misinterpreted the County Attorney's advice and misconstrued the proper procedure to be followed. Given the lack of "clearly established" rights in this area of the law, however, a jury could not reasonably find that the County's failure to appraise Eaton of the proper interpretation of the newly minted Rule 69 procedures amounted to deliberate indifference.

## D.      The private-party defendants

In addition to claiming that the County defendants violated his constitutional rights, Revis named various private-party defendants in his 42 U.S.C. § 1983 and § 1985(3) claims. The group of private-party defendants consists of Emerson, the prevailing plaintiff in the underlying tort litigation, as well as four members of her legal team: Meldrum, Montpelier, Waldo, and Young. Revis focuses on their participation in his eviction. After concluding that none of the private-party defendants qualified as state actors in this case, the district court dismissed all claims against them. Revis has appealed the dismissal only with respect to his § 1983 claim.

The Fourth and Fourteenth Amendment rights at issue secure protection only against infringement through state action. *See, e.g., Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978) ("[M]ost rights secured by the Constitution are protected only against infringement by governments."). Under some circumstances, however, the conduct of private parties may be deemed to be state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Id.* "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* The Court in *Lugar* explained that the two prongs merge when analyzing a state official's conduct, whereas they remain distinct when analyzing the conduct of private parties. *Id.* at 935.

This circuit utilizes three tests to evaluate state action: (1) the public-function test, (2) the state-compulsion test, and (3) the symbiotic-relationship or nexus test. *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). The district court concluded that only the nexus test, which focuses on the extent of the relationship between the state and private actors, has possible

application to the facts of this case. We agree, but further heed the Supreme Court's advice that "[a]midst such variety [of tests], examples may be the best teachers." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297 (2001). Because the alleged state action by private parties in this case stands at the intersection of several lines of authority on the subject, we first review those cases.

One such line of authority deals with the liability of private parties in the context of challenges to state prejudgment attachment procedures. In *Lugar*, Edmondson had obtained a writ of attachment from a state court against Lugar's property, and the county sheriff had executed the writ. 475 U.S. at 924. Lugar then filed an action against Edmondson under § 1983 in which he challenged, among other things, the constitutionality of the state's statutory attachment procedure. *Id*. at 925. The Court first observed that "the procedural scheme created by the statute obviously is the product of state action." *Id*. at 941. This led the Court to hold that a private party invoking the aid of state officials to utilize the challenged state-created prejudgment attachment procedures constituted "joint participation with state officials in the seizure of disputed property" sufficient to characterize the private party as a "state actor." *Id.* at 941.

Later decisions by this court have expressly declined, however, to extend the relatively low bar of *Lugar*'s so-called "joint action" test outside the context of challenged prejudgment attachment or garnishment proceedings. *See Hill v. Langer*, 86 F. App'x. 163, 167 (6th Cir. 2004) (requiring something more than the "joint action" recognized in *Lugar* in the context of a claim of state action by a private citizen invoking a challenged *postjudgment eviction remedy*). *Lugar* also held that the plaintiff's separate claim in that case, which alleged only that the private parties had invoked the statute maliciously or without valid grounds, did not give rise to state action. 475 U.S. at 940. Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute. *Id*. at 940-41.

Another relevant line of cases deals with the flip side of a related issue: the § 1983 liability of public officials in the context of aiding private parties undertaking private repossession remedies. *See Barrett v. Harwood*, 189 F.3d 297, 302 (2d Cir. 1999) (analyzing the "spectrum" of official involvement in a private repossession necessary to give rise to state action, and collecting cases). This court has held that an officer's mere presence at the scene to keep the peace while parties carry out their private repossession remedies does not render the repossession action that of the state. *United States v. Coleman*, 628 F.2d 961, 963-64 (6th Cir. 1980) (holding that no state action arose where the police parked around a corner from the scene of a repossession and were simply standing by in case of trouble). More significant or extensive police involvement in carrying out private remedies, however, can give rise to state action. *See, e.g.*, *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir. 1981) (finding state action where an officer ordered the plaintiff to stand back or get away from his truck—which was the subject of the repossession—and told the plaintiff that further interference would result in arrest).

Finally, a third relevant group of cases deals broadly with allegations of concerted action between state and private actors that is not undertaken pursuant to any challenged state procedure. One such case is *American Postal Workers Union, Local 96 v. City of Memphis*, 361 F.3d 898, 900-01 (6th Cir. 2004), where this court considered a complaint filed against private firms and the City of Memphis that alleged a conspiracy between the firms and the Memphis police to deprive striking workers of their constitutional rights by, among other things, threatening the workers and detaining them without cause. *Id*. at 901-02. In evaluating whether the private firms could be liable as state actors, the court enumerated the standard public-function, state-compulsion, and nexus tests for state action, but stated that those tests are "relevant only in cases in which there are no allegations of cooperation or concerted action between state and private actors." *Id*. at 905.

To determine whether state action arose in the context of such allegations, the court first set forth the general definition of a civil conspiracy: an agreement between two or more persons to injure another by unlawful action. *Id.* The court concluded, by applying that definition, that the union plaintiffs had successfully pled a § 1983 conspiracy by alleging that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed. *Id.* at 905-06; *see also Dennis v. Sparks*, 449 U.S. 24, 28-29 (1980) (holding that a private party may be liable for conspiring with state actors to violate civil rights); *Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000) ("If a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983 . . . ."); *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002) (opining that a private citizen may be liable under § 1983 if he "conspire[s] with a public employee to deprive the plaintiff of his constitutional rights" or if he is "deputized" such that he becomes "a public officer *pro tem*").

The district court properly concluded that Deputy Eaton's eviction of Revis constituted state action. In examining the private-party defendants' liability, however, the court determined that no "overt, significant" state assistance occurred because Eaton was "there merely to make sure that the law was complied with and [to] keep the peace while defendants carried out their private remedies." This analysis, however, misconceives the nature of Tennessee's execution procedure in a crucial way by conflating it with private repossession actions.

Unlike a private repossession action, a writ of execution requires a state official—not the judgment creditor—to sell the judgment debtor's property and pay the net proceeds into the court. *See* Tenn. R. Civ. P. 69.06 ("A levy is effective when the sheriff with a writ of execution exercises control over the judgment debtor's personalty. . . . The sheriff shall sell personalty by auction."); Tenn. R. Civ. P. 69.07 ("[A] levy occurs when the sheriff exercises control over the judgment debtor's realty. . . . The sheriff shall sell the debtor's interest in realty by auction"). This is made plain by the writs themselves, which "command" any "lawful officer to execute and return" the writ by taking the listed property from the judgment debtor, and then paying the proceeds into the court.

The proper question thus becomes not—as we ask in the private repossession context—whether a state official's standby role in a private party's remedy gives rise to state action, but rather just the reverse: whether the private party's role in the alleged constitutional violation by a state official renders the private party's actions fairly attributable to the state. Based on the reasoning of the first line of cases addressed above, Revis's claim that the private-party defendants applied for the writs maliciously or without cause—such as by overstating the judgment amount owed—does not give rise to state action. Significantly, he does not challenge the constitutionality of Tennessee's execution procedures. The private-party defendants' invocation of presumptively valid state procedures therefore amounts, at most, to the sort of statutory misuse or abuse that *Lugar* specifically instructs does not give rise to state action. *See* 457 U.S. at 941.

In addition to arguing that the private-party defendants improperly obtained the writs of execution, Revis asserts that his rights were violated by the eviction that occurred in the course of levying the writs. An argument that the private-party defendants applied for the writs and that Deputy Eaton simply executed them improperly, however, presents even less compelling grounds for attributing the private-party defendants' actions to the state than the claim that Eaton executed the writs properly but in accordance with allegedly flawed state-created procedures. As addressed above, *Hill* determined that even this latter degree of "joint action" did not give rise to state-actor liability for private parties in the postjudgment context. 86 F. App'x at 167.

Similarly, Revis's allegations that the private-party defendants indemnified Deputy Eaton for the expenses associated with the execution, sent Waldo to the scene of the execution, and arranged for hiring the locksmith do not suffice to render them state actors. Tennessee law provides

that judgment creditors "shall pay the cost incurred" in levying writs of execution. Tenn. Code Ann. § 26-3-117. Waldo's presence at the scene when Eaton evicted Revis, moreover, no more served to "deputize" her than, for example, the private locksmith. Regarding the indemnity agreement, this court has held that "[t]he mere existence of a contract between a governmental agency and a private party is insufficient to create state action." *Simescu v. Emmet County Dept. of Soc. Services*, 942 F.2d 372, 375 (6th Cir. 1991). Again, simply invoking or following unchallenged state procedures, even if done in bad faith, does not render the private-party defendants state actors, and this court has confined the *Lugar* "joint action" test to challenged *prejudgment attachment procedures*. *See Hill*, 86 F. App'x at 163.

Revis attempts to reach one step further, however, by asserting that the private-party defendants conspired with Deputy Eaton by forming a common plan to violate Revis's constitutional rights. Such claims of conspiracies between private and state actors, if adequately alleged, generally suffice to establish state action on the part of the private actors for the purpose of deciding a motion to dismiss. *See Local 96*, 361 F.3d at 905-906. But as addressed above, we have determined that Eaton is entitled to summary judgment in part because he did not act according to any plan or conspiracy to violate Revis's constitutional rights. Eaton instead acted according to his own reasonable misinterpretation of what the writs required. Therefore, although the issue of the private-party defendants' role in the alleged conspiracy could not ordinarily be resolved at the pleading stage, Revis's allegations here of a shared conspiratorial objective between Eaton and the private-party defendants to deprive Revis of his constitutional rights necessarily fails based on our earlier determination that Eaton did not so conspire.

Our holding does not imply that Deputy Eaton's qualified immunity extends to the private-party defendants, nor does it establish that a private party can never be liable for conspiring with an official held to be qualifiedly immune. *Cf. Wyatt v. Cole*, 504 U.S. 158, 168 (1992) (holding that private persons who conspire with state officials to violate constitutional rights do not have available "the good faith immunity applicable to public officials"). Instead, Revis is precluded from establishing a set of facts under which the private-party defendants conspired with Eaton because we have determined as a matter of law that Eaton did not act according to any plan or conspiracy to deprive Revis of his constitutional rights.

### E.     The district court's award of attorney fees

The final issue on appeal concerns the district court's award to the private-party defendants of $65,183.61 in fees, representing 75% of the legal expenses for which they sought reimbursement. Although the district court's discretionary award of fees is entitled to deference, this court has held that an award of attorney fees against a losing plaintiff in a civil rights action is "an extreme sanction" that should be limited to "truly egregious cases of misconduct." *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986).

The district court set forth several considerations in its order that it viewed as supporting an award of attorney fees against Revis. Regarding the § 1985(3) claim, the court pointed out that Revis essentially alleged without evidentiary support that Emerson, an African-American, conspired with her legal representatives to discriminate against Revis, who is also an African-American, on the basis of race. Revis did not appeal the district court's dismissal of that claim, and we find no basis on which to conclude that the district court abused its discretion in determining that this claim was frivolous.

As to Revis's § 1983 claim, however, the district court explained that

> Revis sued the private individuals knowing that a critical element of his case was that these defendants were state actors. A close relationship (nexus) between the individuals and the sheriff's deputy who executed on the plaintiff's property, however, was absent, and these individuals' actions could not be fairly attributed to the state.

While we ultimately agree that the acts of the private-party defendants in this case did not amount to state action, our analysis above casts significant doubt on whether this determination was so obvious as to render the claim frivolous. *See Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (noting that the state action doctrine has been variously characterized as "a paragon of unclarity" and "a protean concept") (citations omitted). Furthermore, our conclusion that the district court erred in determining that no constitutional violation occurred renders the question of the private-party defendants' liability in this action significantly closer than the district court appears to have considered.

We are thus uncertain as to how the district court would have evaluated the private-party defendants' request for attorney fees under § 1988 if it had had the benefit of our analysis. Although we have no reason to question its findings regarding Revis's frivolous § 1985(3) claim and his "aggressive and often unnecessary multiplication of filings . . . to harass the defendants," the court's evaluation of Revis's § 1983 claim was in part erroneous for the reasons set forth above. We therefore vacate the district court's award of attorney fees and remand that issue for reconsideration.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** in part, **VACATE** in part, and **REMAND** the case for further proceedings consistent with this opinion.