File Name: 11a0355n.06
NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 09-4594

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*May 25, 2011*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| MARY PRITCHARD; TED PRITCHARD; ZACHARY CHRISTMAN; KEVIN CLARK; TERRY CHRISTMAN, | ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| HAMILTON TOWNSHIP BOARD OF TRUSTEES, | ) ) ) | OPINION |
| Defendant, | ) ) ) | |
| and | ) ) | |
| PHIL JOHNSON, Lieutenant; JEFF BRALEY, Lieutenant; ROGER GILBERT, Officer; GAIL GILBERT; FRANK RICHARDSON, Chief, | ) ) ) ) | |
| Defendants-Appellants. | ) | |

BEFORE:    KEITH, McKEAGUE, KETHLEDGE, Circuit Judges.

**McKeague, Circuit Judge.** This lawsuit stems from the Defendants' actions in planning and conducting an operation to investigate possible underage consumption at a father and son's birthday party. The operation culminated when police officers arrived at the party around midnight and made two arrests. Following the incident, the Plaintiffs brought this lawsuit alleging, *inter alia*, that the Defendants conducted an unlawful search of the property, and made unlawful arrests, in

violation of federal and state law. The Defendants sought qualified immunity as to the federal claims, and statutory immunity as to the state-law claims. The case comes to us on interlocutory appeal, so we only address the district court's denial of qualified and statutory immunity as to the Defendants. Where the Defendants' legal arguments as to qualified immunity rely on disputed facts, we are without jurisdiction to hear the appeal. As to all other grounds for appeal, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual History

Plaintiffs Mary Pritchard and Edward Pritchard (collectively "Pritchards") are married and own a home in Hamilton Township, Ohio. Plaintiffs Terry Christman, Zachary Christman (son of Terry), and Kevin Clark all attended a party at the Pritchard home that was the subject of the police action underlying this lawsuit. Defendants include four police officers who were employed by the Hamilton Township Police Department at the time of this incident: Chief Frank Richardson ("Chief Richardson), Lieutenant Phil Johnson ("Lt. Johnson"), Lieutenant Jeff Braley ("Lt. Braley"), and Officer Roger Gilbert ("Officer Gilbert"). Officer Gilbert now works for another law enforcement agency, and Chief Richardson is deceased. Officer Gilbert's wife Gail Gilbert is a defendant as well. Plaintiffs have also sued the Hamilton Township Board of Trustees, but the Board is not part of the instant appeal.

On August 8, 2007, Lt. Braley held a meeting with concerned citizens at the Hamilton Township Police administrative building. The meeting, which included Lt. Braley's former police academy commander, was held to discuss underage drinking in the Township, an issue that

concerned the citizens because a son of one of two of the citizens had recently been involved in an automobile accident that involved alcohol. The concerned citizens suspected that their son drank alcohol at the Pritchards' home on the night of the accident. They also explained that on a prior occasion they drove by the Pritchard home and saw "kids laying in the front yard." The meeting ended with the citizens informing Lt. Braley that the Pritchards planned to host a party on August 10, and that they suspected that there would be underage drinking at the party. Lt. Braley did nothing further to corroborate this information.

The following day, Lt. Braley met with Chief Richardson and Lt. Johnson to discuss the Pritchard party. Other than the details relayed by Lt. Braley, none of the officers had any reason to suspect underage drinking at the Pritchard home.[1] The next day the three officers developed a plan for monitoring the party. Because the party was going to occur after their regular duty hours, the officers decided—and were approved—to work additional hours that evening. Lt. Johnson also ensured that Ohio Liquor Control agents would be available until midnight—when they planned to end the operation—to provide support.

At approximately 8:00 p.m. on August 10, two Liquor Control agents reported for duty at the police station. At approximately 9:00 p.m., Lt. Braley began driving past the Pritchard residence every 30 minutes in an unmarked police car. Lt. Braley did not see anything unusual for most of the evening, reporting back that everything was "going okay," and that "nothing was happening." Lt. Braley did not report any observations that would create a suspicion of underage drinking, or any

---

[1]There is an inconsistency in the record about what Lt. Braley actually reported at the meeting. Lt. Johnson testified that Lt. Braley's information came from local school personnel. However, Lt. Braley testified that he only relayed information citizens.

other unlawful activity. Lt. Braley alleges that this changed at around 11:45 p.m.— during what was planned to be Lt. Braley's final pass—when Lt. Braley claims that he saw four individuals in the side yard, and that one of the individuals appeared to be intoxicated and was yelling very loudly. However, because it was so dark, Lt. Braley could not describe any of the individuals except to say that the voice he heard was from a male. Lt. Braley could also not tell if the individuals were underage. Lt. Braley reported these observations to Lt. Johnson, but did not investigate any further because it was against departmental policy for a plain-clothes officer to go onto the property in a non-emergency situation. Lt. Braley returned to the police station. By contrast, the Plaintiffs maintain that the party was calm and relatively quiet at all times.

Back at the police station, Lt. Johnson, Chief Richardson and Officer Gilbert were in their respective police cruisers, parked side by side, with Chief Richardson's driver-side window positioned next to Lt. Johnson's driver-side window, and Officer Gilbert's driver-side window positioned next to Lt. Johnson's passenger-side window. There were no complaints from neighbors or other private citizens about the party that night. However, at some point before Lt. Braley's last report, Officer Gilbert recalls that Lt. Johnson and another officer, possibly Lt. Braley, discussed the prospect of having Lt. Johnson's wife place a fictitious noise complaint. Then later, after Lt. Braley's final report, Lt. Johnson instructed Officer Gilbert to call his wife, Gail Gilbert, and to ask her to place an anonymous noise complaint with the county dispatcher regarding the Pritchard residence.[2] The Gilberts lived in the neighboring county, and other than what Officer Gilbert told

---

[2]Because Chief Richardson was closer to Lt. Johnson during this conversation, Officer Gilbert testified that he believes that Chief Richardson heard all of this. Chief Richardson, however, denied being present during this conversation and testified that he did not find out about the

- 4 -

her, Gail Gilbert did not have first-hand knowledge about the party. Lt. Johnson then instructed Officer Gilbert, and perhaps another officer, to head toward the party, in anticipation of the dispatcher issuing a call over the radio. Shortly thereafter, the dispatcher put out a radio call requesting officers to respond to the noise complaint.

The Pritchards were hosting a party to celebrate the birthdays of Ted Pritchard and his son Stephen. Officer Gilbert was the first officer on the scene and pulled his police car into the driveway. At the time, Mary Pritchard recalls that the party was not noisy and that no one was misbehaving. She met Officer Gilbert at the front of the house and identified herself as the homeowner. Officer Gilbert's next act is highly disputed by the parties. Mary Pritchard maintains that Officer Gilbert brushed past her and went immediately to her backyard, at which point a few people in the backyard took off running.[3] Officer Gilbert then immediately pursued the individuals through the backyard, and at about the same time she recalls approximately 22 police officers "storming" around both sides of her house. Officer Gilbert maintains instead that while he was speaking with Mary Pritchard he heard someone yell "run" and saw multiple subject take off. He

---

fraudulent noise complaint until a week later.

Lt. Johnson testified that he wanted the noise complaint to be placed because he was concerned that there was too much radio traffic. He wanted to make sure that officers were ready to provide back-up at the Pritchard residence. Chief Richardson testified that any of the officers could have requested the dispatcher to have officers respond, and that having the anonymous call placed probably *delayed* the radio dispatch. Lt. Johnson was ultimately reprimanded for this aspect of the incident.

[3]Mary Pritchard claims she heard one person yell "run, Forrest," which she understood to be a joke from the movie *Forrest Gump*, and then the individuals ran.

further maintains that he entered the backyard only to pursue the subjects who where "running from a [noise] complaint."

During the pursuit, Officer Gilbert says that he made a radio call to alert other officers that he was in a foot pursuit with one of the suspects. The individual that Officer Gilbert pursued turned out to be Zac Christman. Christman recalls running after seeing 10 police officers "swarming" onto the property through the side yard. He also recalls hearing officers yell "tase him, tase his fucking ass" during the chase. Christman estimates that he ran for about 30 seconds before he fell and was apprehended by Officer Gilbert. Lt. Johnson then took Christman to one of the police cruisers, where he remained for approximately 30 minutes. Christman's father Terry Christman observed the events, identified himself, and sought to discuss the matter with police officers. Terry Christman reports that officers refused to talk with him and threatened to arrest him if he persisted. The officers did not administer a breathalyser or field sobriety test, but Zac Christman was underage, and he admitted to consuming alcohol. Lt. Johnson told Officer Gilbert to charge Zac Christman with underage drinking and disorderly conduct. Officer Gilbert reviewed the citations before signing them. Christman was then released to his father. Christman hired an attorney and had one court appearance, but because Ohio law permits an underage individual to drink with a parent's permission on private property, the charges were eventually dismissed.

Lt. Braley arrived at the scene and spoke with Mary Pritchard in her side yard. The Pritchards recall Lt. Braley threatening to the "take [her] fucking house" because she supplied alcohol to minors. Mary Pritchard also recalls Lt. Braley threatening to take her to jail as well as threatening to call her son's college football coach to tell him about the party. Overall, Mary

Pritchard described Lt. Braley as "nasty, aggressive, [and] pointing his finger at me." Lt. Braley admits that he informed Mary Pritchard that they could seize her house, and that he talked about Stephen Pritchard's football coach, but he denies yelling and threatening in an aggressive manner. Other Plaintiffs and witnesses generally describe a "chaotic" scene with officers yelling, acting aggressively, and threatening to use their tasers on people.

At some point during these events, Kevin Clark, who was 21 years old at the time of the party, was using his cell phone to record the police activity. An officer approached Clark and asked him what he was doing, Clark responded and the officer walked away. Approximately five minutes later another officer told Clark to stop recording and Clark complied. Shortly thereafter, Clark claims that he opened his cell phone to view a text message. He was then arrested by Officer Gilbert and charged with disorderly conduct by Lt. Johnson. Lt. Johnson maintains that they were concerned that Clark's recording might reveal the identify of undercover liquor control agents if it was disseminated online. Clark hired an attorney and the charges were eventually dismissed.

Days after the incident Mary Pritchard received two anonymous letters purporting to be from a law enforcement officer. The first letter described the events of the evening, including the fact that the noise complaint came from a police officer's wife. The letter roughly alleged a conspiracy among several officers to unlawfully raid the party. The second letter was a copy of a letter that contained the same allegations, which was sent to the Ohio Attorney General. The Hamilton Township police suspect that the letter came from one or more of their own officers.

**B. Procedural History**

Plaintiffs filed this action in federal court on April 8, 2008, alleging various claims under 42 U.S.C. § 1983 and Ohio law. After some discovery, the Defendants filed a motion for summary judgment and asserted qualified immunity as to the § 1983 claims, and statutory immunity as to the state-law claims. Plaintiffs filed a cross-motion for partial summary judgment. As to both motions, the district court granted them in part and denied them in part on various grounds. Defendants now appeal the denial of summary judgment with respect to the following claims: (1) the denial of qualified immunity to all Defendant officers as to the Pritchards' Fourth Amendment claims for unlawful search of their property; (2) the denial of qualified immunity to Lt. Johnson and Officer Gilbert as to Kevin Clark's Fourth Amendment claim for unlawful arrest; (3) the denial of qualified immunity to Lt. Johnson and Officer Gilbert as to Zac Christman's Fourth Amendment claim for unlawful arrest; (4) the denial of qualified immunity to all Defendant officers and Gail Gilbert as to the civil conspiracy claims; (5) the denial of statutory immunity to Lt. Johnson and Officer Gilbert as to Zac Christman's false arrest and malicious prosecution claims; (6) the denial of statutory immunity to Lt. Johnson and Officer Gilbert as to Kevin Clark's false arrest and malicious prosecution claims; and (7) the denial of statutory immunity to Lt. Braley, Lt. Johnson, and Officer Gilbert as to Mary Pritchard's claim for intentional infliction of emotional distress.

## II. ANALYSIS

Title 28 U.S.C. § 1291 authorizes appellate review of a district court's final order. Generally, a district court's denial of summary judgment is not immediately appealable because it is not a final order. *See Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). Likewise, a denial of qualified immunity that is premised on the district court's finding that material facts are in dispute is not

immediately appealable, but a district court's denial of qualified immunity on purely legal grounds

is immediately appealable. *Smoak v. Hall*, 460 F.3d 768, 776–77 (6th Cir. 2006) (citations omitted).

Accordingly, on interlocutory appeal we only have jurisdiction where a defendant limits his

argument to "questions of law premised on facts taken in the light most favorable to the plaintiff."

*Meals v. City of Memphis*, 493 F.3d 720, 726–27 (6th Cir. 2007). We lack jurisdiction "[w]here

qualified immunity is denied due to a lingering question of whether the evidence supports a finding

that particular offensive conduct occurred." *Id*. at 727; *see also Harris v. City of Circleville*, 583

F.3d 356, 364 (6th Cir. 2009) (noting that a defendant's occasional factual argument will not destroy

jurisdiction as long as we are still able to address the defendant's argument on questions of law that

are premised on the facts taken in the light most favorable to the plaintiff).

An order denying statutory immunity is only immediately appealable "if the state law

provides immunity from suit, as opposed to immunity simply from liability." *Chesher v. Neyer*, 477

F.3d 784, 793 (6th Cir. 2007). Ohio statutory immunity provides "immunity from suit, and thus

warrants interlocutory appellate jurisdiction under the collateral order doctrine." *Id*. at 794.

## A. The Denial of Qualified Immunity

We conduct *de novo* review of a district court's denial of qualified immunity. *Meals*, 493

F.3d at 728. "In order to prevail on a civil rights claim under 42 U.S.C. § 1983, [a plaintiff] must

establish that a person acting under color of state law deprived him of a right secured by the

Constitution or laws of the United States." *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009)

(citation omitted). The plaintiff must also overcome the defense of qualified immunity, which if

granted, shields government officials from personal liability. *Id*. Qualified immunity exists to

"acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id*. at 494 (citation omitted). "The doctrine protects all but the plainly incompetent or those who knowingly violate the law." *Id*. To that end, we ask two questions to determine whether qualified immunity applies: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Id*; *see also Saucier v. Katz*, 533 U.S. 194, 200 (2001). We are free to address these questions in any sequence. *Pearson v. Callahan*, 129 S. Ct. 808, 821 (2009). While the defendant must be willing to concede the most favorable view of the facts to the plaintiff on interlocutory appeal, the plaintiff still carries the burden of demonstrating that the officials should not be shielded by qualified immunity. *Everson*, 556 F.3d at 494 (citations omitted). We will address whether qualified immunity is warranted as to each of the § 1983 claims in turn.

**1. Unlawful Search**

The Pritchards allege that the Defendant officers violated their Fourth Amendment rights by conducting an unlawful search of their property. Defendants argue that the district court erred in denying qualified immunity as to this claim. Plaintiffs respond that this Court does not have jurisdiction to hear this appeal because the denial of qualified immunity was based on a disputed issue of material fact.

The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers and effects[ ] against unreasonable searches and seizures." U.S. Const. amend. IV. This right is of particular import in a person's home:

> [t]he Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individuals home–a zone that find its roots in clear and specific constitutional terms . . . at the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.

*Payton v. New York*, 445 U.S. 573, 589–90 (1980) (internal citations and quotation marks omitted).

Thus, the Supreme Court has held that "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," *id*. at 586, in absence of exigent circumstances or consent. The protections that the Fourth Amendment provides inside the home have reach beyond the walls of the home. The curtilage of the home, which at common law was "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" is considered part of the home for Fourth Amendment purposes. *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The Supreme Court has provided four factors for determining whether an area is part of the home's curtilage: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether an area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

We have previously held that the backyard of a residence is part of the curtilage. *See Jacob v. Twp. of West Bloomfield*, 531 F.3d 385, 390 (6th Cir. 2008); *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 582 (6th Cir. 2005) (holding that the cleared area surrounding a home, including the backyard, is the curtilage of the house despite the lack of fencing); *Daughenbaugh v. City of Tiffin*,

150 F.3d 596, 602–03 (6th Cir. 1998) (holding that a home's backyard was curtilage even though neighbors could see at least a portion of the backyard); *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997). Here, the Pritchards' backyard directly abutted the house, was not able to be viewed from the street, and was used for the domestic privacies of life— as demonstrated by the patio, pool and use of the backyard for hosting a birthday party. Thus, it was part of the curtilage of the house. Perhaps because there is no question that the Fourth Amendment's protection against warrantless searches of the curtilage was clearly established at the time of this incident, *Jacob*, 531 F.3d at 393, the parties focus their arguments on the first qualified immunity question, whether there was a violation of a constitutional right. We will individually consider this question as to each officer.

***Officer Gilbert.*** Plaintiffs allege that Officer Gilbert pulled into the Pritchards' driveway, spoke with Mary Pritchard for a moment in the front yard, and then walked around her and went into the backyard—the curtilage of their home—without a warrant or exigent circumstances. If true, this is a Fourth Amendment violation. In response, Officer Gilbert makes two arguments, both of which rely on disputed facts. First, Officer Gilbert argues that he was on the property to conduct what is often called a "knock and talk." A knock and talk —where a police officer knocks on the front door of a home for purposes of speaking to the occupants or asking for consent to search the premises —is a legitimate investigative technique that does not necessarily run afoul of the Fourth Amendment, even if it requires the police officer to enter the curtilage of the home. *See United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005). An officer may initiate a knock and talk without any objective level of suspicion. *Id.* (citation omitted). This technique is permissible so long as the encounter does not evolve into a constructive entry, *id.*, and we have previously held that a permissible knock and

talk can take place in the backyard if knocking on the front door is unsuccessful, and there are indications that someone is in or around the house, *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 654 (6th Cir. 2006). The problem with the Defendants' arguments here is that even if the initial encounter with Mary Pritchard was a knock and talk, Plaintiffs maintain that the encounter became a constructive entry the moment Officer Gilbert walked by Mary Pritchard and entered the backyard without justification.[4] Officer Gilbert further argues that his entry into the backyard was justified because there were exigent circumstances. We have identified four exigent circumstances that permit a law enforcement officer to make a warrantless search of person's home or curtilage: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent the suspect's escape, or (4) a risk of danger to the police or others. *Taylor v. Michigan Dept. of Natural Resources*, 502 F.3d 452, 461 (6th Cir. 2007) (citation omitted). Officer Gilbert contends that he only entered the backyard to prevent the escape of Zac Christman, who took off running after someone yelled "run!" while Officer Gilbert was speaking with Mary Pritchard. Even assuming *arguendo* that Officer Gilbert would be justified in making an entry into the Pritchards' backyard under those circumstances, his argument here relies on disputed facts.[5] Because Plaintiffs maintain

---

[4]The Plaintiffs also maintain that the initial encounter with Mary Pritchard was not a knock and talk because Officer Gilbert does not know what a knock and talk is and his objective was always to go into the backyard to investigate the party. We need not address this question for the purposes of this appeal.

[5]We note that the Supreme Court has cautioned against the use of exigent circumstances as a basis for a warrantless entry when the suspected crime is a minor offense. *Welsh v. Wisconsin*, 466 U.S. 740, 750–51 (1984) ("Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor."). Also, while unprovoked flight from a police officer may be indicative of wrongdoing, we generally require more to create a reasonable

that this sequence of events occurred *after* Officer Gilbert entered the backyard, Plaintiffs allege that the unlawful search occurred before the alleged exigent circumstances arose.

The existence of disputed issues of material fact was the basis for the district court's denial of qualified immunity on this claim, and we agree. Further, we find that the Defendants have refused to concede Plaintiffs' view of the facts, and that both of Officer Gilbert's legal arguments are premised on his version of the incident.

***Lt. Johnson.*** Plaintiffs likewise allege that Lt. Johnson unlawfully entered the curtilage of their home without a warrant or exigent circumstances. Lt. Johnson contends that he was responding to Officer Gilbert's radio broadcast of a foot pursuit and that this exigent circumstance—responding to an officer's call for assistance—justified his entry onto the Pritchards' property. Again, the officer's legal argument relies on disputed facts. Lt. Johnson contends that he started en route to the Pritchard house only when he heard the radio call. However, Officer Gilbert testified that Lt. Johnson was there when he apprehended Zac Christman, and Zac Christman testified that the foot pursuit lasted about 30 seconds. This suggests that Lt. Johnson was already on the scene when the radio call was placed. These facts, viewed in the light most favorable to the Plaintiffs, could allow a jury to conclude that Lt. Johnson was already at the Pritchard house and on the property before any radio call was placed, and before any possible exigent circumstances arose, precluding qualified immunity on this claim.

---

suspicion of criminal activity. *See e.g., Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (holding that a suspect's unprovoked headlong flight upon noticing police officers while in an area of heavy narcotics trafficking is sufficient to arouse a reasonable suspicion); *United States v. Johnson*, 620 F.3d 685, 694–95 (6th Cir. 2010) (collecting cases).

***Lt. Braley.*** The Pritchards also allege that Lt. Braley similarly violated their Fourth Amendment rights. It is unclear whether the Pritchards allege that Lt. Braley entered the curtilage of their home. Lt. Braley testified that he was at the police station when he heard Officer Gilbert's foot pursuit radio call. It is undisputed that Lt. Braley went into the Pritchards' side yard, but our own review of the record does not show that the Plaintiffs have argued that the curtilage to the Pritchard home included the side yard.[6] Thus, it appears that the Pritchards have not alleged that Lt. Braley actually committed an unlawful search of their property. However, the Pritchards also argue that Lt. Braley's involvement in the planning and ordering of the incident make him liable for the actions of Officer Gilbert under the theory of supervisory liability.

We have held that a supervisory officer may be liable under § 1983 if it is shown that the superior officer "encouraged or condoned the actions of [the inferior officer]." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). A *respondeat superior* theory of liability will not suffice here because liability must be based on more than the right to control employees or simple negligence. *See id*. "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citing *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)). Here, Plaintiffs have alleged that Lt. Braley made up his mind to "raid"

---

[6]Whether the side yard is part of curtilage is an open question in this case. *Compare United States v. Cousins*, 455 F.3d 1116, 1122–24 (10th Cir. 2006) (finding that a partially enclosed side yard that was used as a garden does not constitute the curtilage of the house), *with Palmieri v. Lynch*, 392 F.3d 73, 93–94 (2d Cir. 2002) (holding that a side yard and backyard are included in the curtilage to the home). We decline to evaluate whether the Pritchards' side yard is part of the curtilage to the house because the parties have not set forth facts that would allow us to undertake the task.

the Pritchards' party from the moment he met with his former police academy commander. They also claim that Lt. Braley—faced with the prospect that the operation was coming to an end without any reports of problems at the party—fabricated his report that someone in the Pritchards' side yard was yelling. Furthermore, Plaintiffs point to evidence that Lt. Braley and Lt. Johnson came up with the idea to have a police officer's wife place a false noise complaint. Without these alleged acts, the Plaintiffs maintain that no police officers would have ever entered their property. Indeed, Defendants concede that Officer Gilbert was sent to the scene *based* on the information provided by Lt. Braley. Plaintiffs also suggest that Lt. Braley's alleged aggressive and angry behavior at the scene lends support to their theory. From these facts, viewed in the light most favorable to the Plaintiffs, a reasonable jury could conclude that Lt. Braley not only encouraged or condoned the actions of Officer Gilbert, but that Officer Gilbert's actions were a direct result of Lt. Braley's planning and acts.

*Chief Richardson* It is undisputed that Chief Richardson did not enter the Pritchards' property, thus liability can only attach to Chief Richardson here in his role as a supervisor. For this proposition Plaintiffs note that Chief Richardson had a role in planning and ordering the intrusion on their property. Plaintiffs maintain that Chief Richardson was present during at least one of the meetings regarding the party at the Pritchards. Plaintiffs also allege that Chief Richardson was with Lt. Johnson in the police station parking lot when the plan to place a false noise complaint was formulated, as well as when the call was placed. Notably, Chief Richardson later reprimanded Lt. Johnson for this act, despite his own alleged knowledge of the plan. Still, there does not seem to be evidence that Chief Richardson *encouraged* the alleged unlawful acts, and generally, a passive role

or a mere failure to act is insufficient to demonstrate that an officer condoned the act. *Bass*, 167 F.3d at 1048   However, we have held that there is a disputed issue of material fact as to whether the officer encouraged or condoned the alleged unconstitutional act where there is evidence of a failure to act *and* an attempt on the part of the supervisory officer to conceal the improper acts. *Id*. Plaintiffs have made such a showing here, pointing to two alleged cover-ups that are pertinent to Chief Richardson.  First, Plaintiffs argue that because the supervisory officers—including Chief Richardson— always planned to "raid" the party,  they caused the false noise complaint to be placed in hopes covering up the impropriety of the raid when Lt. Braley's surveillance came up short.  Next, Plaintiffs argue that Chief Richardson attempted to cover-up his own involvement and knowledge of this plan by testifying that he found out about it a week later, which is contradicted by Officer Gilbert's testimony.  Plaintiffs also suggest that Officer Gilbert was dispatched to conduct a warrantless search because he did not conduct a knock and talk and does not even know what a knock and talk means.  Finally, we note that the Plaintiffs received anonymous letters—which allegedly came from police officers in the Hamilton Township police department—that accused their fellow officers of conceiving this scheme.  These alleged facts, viewed in the light most favorable to the Plaintiffs, rise above a *respondeat superior* theory of liability.  A reasonable jury could conclude that Chief Richardson condoned this scheme and that his behavior contributed to the alleged constitutional violation.

Because Officer Gilbert and Lt. Johnson's legal arguments rely on their own version of the facts, we are without jurisdiction to entertain their appeal of the denial of qualified immunity as to this claim. *See Harris*, 583 F.3d at 364.  We agree that the Plaintiffs' version of the facts does not

show that Lt. Braley and Chief Richardson unlawfully searched the Pritchards' property. However, because we find that the Plaintiffs' version of the facts would allow a reasonable jury to could conclude that Lt. Braley and Chief Richardson encouraged and/or condoned the alleged unlawful search of the Pritchards' property, we affirm the district court's denial of qualified immunity to Lt. Braley and Chief Richardson on this claim.

**2. Wrongful Arrest**

Kevin Clark and Zac Christman allege that Lt. Johnson and Officer Gilbert violated their Fourth Amendment rights by arresting them without probable cause. Defendants argue that the district court erred in denying them qualified immunity as to both claims.

An individual who has been wrongfully arrested or seized under the color of law can make a § 1983 claim based on the Fourth Amendment. *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). "[I]n order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police officer lacked probable cause." *Id.* (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)); *see also Davenpeck v. Alford*, 543 U.S. 146, 152 (2004). "But under § 1983, an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Everson*, 556 F.3d at 499 (citations omitted). "[E]ven if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful." *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 214 (6th Cir. 2011).

We must consider the information possessed by the officer in the totality of the circumstances because "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence." *Everson*, 556 F.3d at 498. Likewise, an officer may not make "hasty, unsubstantiated arrests with impunity." *Id*. While federal law dictates whether probable cause existed for the arrest, "[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Leonard v. Robinson*, 477 F.3d 347, 354 (6th Cir. 2007) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). Because the law is "clearly established that, absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual," *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999), we will focus on the first qualified immunity question.

**Kevin Clark.** Defendants maintain that they had probable cause to arrest and charge Clark for disorderly conduct, and that Clark was charged under Ohio Rev. Code § 2917.11(B)(2). Plaintiffs maintain that Clark was charged under Ohio Rev. Code § 2917.11(B)(1), and that the Defendants lacked probable cause. The district court concluded that it was impossible to tell which subsection Clark was charged with because the citation was illegible. In relevant part, the two sections provide:

> (B) No person, *while voluntarily intoxicated*, shall do either of the following:
>
> (1) In a public place or in the presence of two or more persons, engage in conduct likely to be offensive or to cause inconvenience, annoyance, or alarm to persons of ordinary sensibilities, which conduct the offender, if the offender were not intoxicated, should know is likely to have that effect on others;
>
> (2) Engage in conduct or create a condition that presents a *risk of physical harm* to the offender or another, or to the property of another.

Ohio Rev. Code § 2917.11(B) (emphasis added). Even assuming *arguendo* that Clark was charged under subsection (B)(2), Defendants have not developed any argument as to why it was reasonable to arrest Clark for this crime. "The statute therefore requires both that an individual is 'voluntarily intoxicated' and that the individual 'present[ ] a risk of physical harm' either to himself, another, or another's property." *McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 517 (6th Cir. 2001). Defendants only note that Clark had "been told to stop videotaping the officers," and that "[w]hen he retrieved his cell phone from his pocket, an officer believed he had resumed photographing the activities." Defendants have not explained why it was reasonable for the officer to believe that (1) Clark was intoxicated and (2) the act of videotaping presented a risk of physical harm. Issues that are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004). Accordingly, we affirm the district court's denial of qualified immunity as to this claim.

***Zac Christman.*** The district court denied qualified immunity to Lt. Johnson and Officer Gilbert on Christman's § 1983's claim as a matter of law. Defendants maintain that they had probable cause to arrest Zac Christman for underage consumption and disorderly conduct. Looking first to the disorderly conduct charge, Defendants state that "Christman was also charged with disorderly conduct apparently stemming from his running from the officer pursuant to [Ohio Rev. Code] § 2917.11(B)." The only accompanying argument is that "[u]nder the circumstances . . . [the Defendants'] actions were objectively reasonable." There is no explanation or argument as to why it was objectively reasonable for the officer to believe that (1) Christman was intoxicated and (2) that running from the police was conduct that presented a risk of harm to Christman or someone else.

Because Defendants have not developed this argument, we deem it to be waived.[7] *Spirko*, 368 F.3d at 612.

This leaves the arrest and charge for underage consumption. Defendants can still escape liability from Christman's entire claim if they are able to show that they are entitled to qualified immunity on this claim because Defendants only needed probable cause to arrest Christman on "*a* charge," rather than *all* charges. *Atkins v. Twp. of Flint*, 94 Fed. App'x 342, 348 (6th Cir. 2004) (emphasis in original). Looking first to the underage consumption statute, Ohio law provides in relevant part:

> No underage person shall knowingly . . . consume any beer or intoxicating liquor in any public or private place. No underage person shall knowingly be under the influence of any beer or intoxicating liquor in any public place. The prohibition set forth in (E)(1) of this section against an underage person knowingly possessing, consuming, or being under the influence of any beer or intoxicating liquor *shall not apply if the underage person is supervised by a parent . . . .*

Ohio Rev. Code § 4301.69(E)(1) (emphasis added).

---

[7]We note that there is no evidence in the record as to either of the two elements. There is evidence that Christman had consumed alcohol, but there is no evidence that the officers thought he was intoxicated. Likewise, the "second element requires some affirmative showing of dangerousness, as the sole fact that an individual is intoxicated does not give rise to a § 2917.11(B)(2) infraction." *McCurdy*, 240 F.3d at 516 (citations omitted). At least one Ohio court has held that running from a police officer in a bad neighborhood while drunk at 2:30 a.m. does not create the risk of harm contemplated by this statute, even though the police officer ordered the defendant to stop. *State v. Pennington*, No. 1998CA00137, 1998 WL 818632, at *1–2 (Ohio Ct. App. Nov. 16, 1998). The committee comment to the statute provides two examples of violations, when someone is intoxicated and "he attempts a tight rope on a bridge parapet or curls to sleep in a doorway in freezing weather." *Id*. Thus it appears that Christman's conduct—running from an officer and ignoring the officer's order to stop—does not rise to the level of dangerousness contemplated by this statute.

Next, we look to the information possessed by Defendants at the time of the arrest. *Everson*, 556 F.3d at 499. There is no dispute that Christman was underage and had consumed alcohol at the party. Further, Defendants do not seem to dispute that they knew Christman's father was with him at the party: Lt. Johnson spoke to Christman's father at the scene, and Officer' Gilbert's incident report states that Christman "was released to his father who was at the party." Defendants certainly could not have ignored the fact that Christman's father was present and charged Christman with underage consumption anyway. *See Ahlers v. Schebil*, 188 F.3d 365, 371–72 (6th Cir. 1999) (explaining that police officers may not "simply turn a blind eye toward potentially exculpatory evidence known to them"). These facts all support the district court's conclusion that the Defendant officers lacked probable cause because they possessed all of the facts necessary to determine that Christman had not violated the plain language of the Ohio underage consumption statute at the time of his arrest.

However, Defendants argue that they were missing one additional piece of information; they were unaware that Ohio's underage consumption statute excepted Christman's behavior.[8] The question before us on appeal is whether it was reasonable for Lt. Johnson and Officer Gilbert to believe that the arrest of Christman for underage consumption was lawful in light of the information possessed by the officers and clearly established law. *Everson*, 556 F.3d at 499. To determine whether the Defendant officers' alleged ignorance of the Ohio underage consumption statute is relevant to this question, we must dive a little deeper into the qualified immunity doctrine. "'In

---

[8]There is no evidence in the record concerning Lt. Johnson's knowledge, or lack thereof, of the underage consumption statute. Officer Gilbert testified that he still remains unaware of whether a minor may consume alcohol on private property with a parent.

general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.'" *Everson*, 556 F.3d at 499 (quoting *Fridley*, 291 F.3d at 872). But,"[q]ualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citation omitted). By protecting "all but the plainly incompetent or those who knowingly violate the law," qualified immunity "gives ample room for mistaken judgments." *Id*. (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Furthermore, the doctrine of qualified immunity applies "irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citing *Pearson*, 129 S. Ct. at 815). The record before us shows that this was not a mistake of fact because the Defendant officers possessed all of the necessary information to know that Christman's conduct was legal. Thus, the more narrow question before us on appeal is whether the Defendants' alleged mistake about the Ohio underage consumption statute was reasonable.

In a line of cases, our Court has addressed a somewhat analogous situation, whether an officer has probable cause to arrest an individual who may have an affirmative justification for a suspected criminal act. *See Fridley*, 291 F.3d at 872; *Painter v. Robertson*, 185 F.3d 557 (6th Cir. 1999); *Estate of Dietrich v. Burrows*, 167 F.3d 1007 (6th Cir. 1999). In both *Dietrich* and *Painter*, the arrestee was charged with carrying a concealed weapon despite the presence of a statute that provided that an individual engaged in a business activity that is particularly susceptible to criminal attack has an affirmative defense to the charge. *Painter*, 185 F.3d at 564–65*; Dietrich*, 167 F.3d at 1010–11. In both cases we denied qualified immunity, holding that the arresting police officers

- 23 -

lacked probable cause because the officers were aware of sufficient facts and circumstances to establish that the arrestees had a statutorily legitimated affirmative justification for the suspected criminal act at the time of the arrest. *Painter*, 185 F.3d at 571; *Dietrich*, 167 F.3d at 1012.

In *Fridley*, we discussed the meaning of the two cases. We identified the general rule as follows: "probable cause determinations include 'facts and circumstances establishing a statutorily legitimated affirmative justification for the suspected criminal act.'" 291 F.3d at 873 (quoting *Painter*, 185 F.3d at 570). Then we explained two corollaries to this rule. First, "'a peace officer, in assessing probable cause to effect an arrest, may not ignore information known to him which proves that the suspect is protected by an affirmative legal justification.'" *Id*. (quoting *Painter*, 185 F.3d at 571). Next, we noted that the general rule "'does not mandate that law enforcement operatives should conduct quasi-trials as a necessary predicate to the warrantless arrest of perpetrators. . . . Rather, [the] court . . . merely resolves that, where a reasonable officer would conclusively know that an investigative target's behavior is protected by a legally cognizable affirmative defense, that officer lacks a legal foundation to arrest that person for that behavior.'" *Id*. (quoting *Painter*, 185 F.3d at 571 n.21). In these cases, when we refer to whether an officer would conclusively know that the defendant is protected by an affirmative defense, we have focused entirely on the facts and circumstances known to the officer at the time of the arrest; not on the officer's knowledge, or lack thereof, of the statute that provides the defense. Knowledge of the statute is imputed to the police officers. Here, Defendants have not advanced an argument against imputing knowledge of the Ohio underage consumption statute to the police officers. The language

and meaning of this statute is unambiguous, and we see no reason to hold that it would be reasonable for an officer to be ignorant of the very statute that he is enforcing.[9]

At first blush it might seem unduly harsh to have an expectation that law enforcement officers should know the intricacies of criminal statutes, but this position finds support in other areas of the qualified immunity doctrine that regularly impute knowledge of statutes and caselaw to officers. Indeed, it is a touchstone of qualified immunity doctrine that "a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982). For instance, we impute knowledge of state-law definitions and state-court interpretations of a statute to police officers when we decide whether an officer could reasonably conclude that probable cause exists under a given set of circumstances. *See, e.g., Kennedy*, 635 F.3d at 215–16; *Logsdon v. Hains*, 492 F.3d 334, 341–43 (6th Cir. 2007). Likewise, we impute knowledge of clearly established constitutional caselaw to police officers when we state that the "binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point," places a law enforcement official "'on notice that [his] conduct violates established law.'" *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (citation omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); s*ee also Leonard v. Robinson*, 477 F.3d 347, 358–61 (6th Cir. 2007) (imputing knowledge of First Amendment principles to an officer,

---

[9]Indeed, an ignorance of the law defense—especially when the law is clear— in the qualified immunity context "might foster ignorance of the law or, at least, encourage feigned ignorance of the law." *Glasson v. City of Louisville*, 518 F.2d 899, 909–10 (6th Cir. 1975). Permitting an officer to be ignorant of the law would also draw a stark contrast with our long tradition of imputing knowledge of criminal statutes to the general public. *See e.g., Bryan v. United States*, 524 U.S. 184, 195 (1998) (noting that the traditional rule is that "ignorance of the law is no excuse" for a defendant's criminal conduct).

and holding that probable cause did not exist because the officer should have known that the defendant's conduct was protected by the Constitution, even though it was probably prohibited by the statute); *Robinson v. Bibb*, 840 F.2d 349, 350 (6th Cir. 1988) (noting that we expect a reasonably competent officer to know the law governing his conduct but suggesting that it might be unfair to impute knowledge of a case to an officer only four days after the case is decided).

In light of these principles, and the abundantly plain language of the statute at issue here, we hold that the Defendant officers did not have probable cause to arrest Christman for underage drinking because the facts and circumstances known to the officers established a statutorily affirmative justification of the suspected criminal act. *Fridley*, 291 F.3d at 873. Accordingly, we affirm the district court's denial of qualified immunity as to this claim.

**3. Civil Conspiracy**

The Plaintiffs allege that the Defendant Officers and Gail Gilbert conspired to violate their civil rights by "entering into an agreement to carry out the planned unlawful raid." Defendants argue that the district court erred in denying qualified immunity as to these claims. A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). To successfully plead a civil conspiracy, Plaintiffs must allege that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the Plaintiffs of their constitutional rights, and (3) an overt act was committed." *Id*. (citation omitted). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985).

"If a private party has conspired with state officials to violate constitutional rights, then that party

qualifies as a state actor and may be held liable pursuant to § 1983." *Cooper v. Parrish*, 203 F.3d

937, 953 n.2 (6th Cir. 2000) (citing *Wyatt v. Cole*, 504 U.S. 158, 168–69 (1992)).

Private citizens are generally not entitled to qualified immunity from suit under § 1983. *Id*.

at 952. However, Defendants contend that Gail Gilbert should not be subject to this general rule.

We have recognized a limited exception for "'certain private defendants, such as doctors or lawyers

who performed services at the behest of the sovereign.'" *Cullinan v. Abramson*, 128 F.3d 301, 310

(6th Cir. 1997) (quoting *Richardson v. McKnight*, 521 U.S. 399, 407 (1997) (denying qualified

immunity to private parties who operated a prison at behest of the state because there was no

historical tradition of granting immunity in that context)). Gail Gilbert's actions—placing a false

noise complaint at the behest of her police-officer husband—do not fit within our Court's narrow

category of private actors entitled to qualified immunity. In *Cullinan* this Court granted qualified

immunity to outside counsel that was hired to perform basically the same function as the city's in-

house counsel. *Id*. at 310. In contrast, in *Cooper* we denied qualified immunity to an attorney who

was working alongside prosecutors to pursue legal action against nightclubs. 203 F.3d at 952–53.

The *Cooper* Court found that the important distinction here was that the attorney was not officially

acting at the sovereign's behest because he was not retained via contract or paid by the government.

*Id*. at 952. Furthermore, the Court thought that granting qualified immunity to the private attorney

would be inconsistent with the goals and objectives of the doctrine because he was not performing

any "unique government functions when he allegedly engaged in the unconstitutional conduct at

issue." *Id*. at 953. Here, Gail Gilbert was clearly not "paid" or "retained" by the government to

perform any function. Likewise, she was not overtly performing or acting at the behest of the government when she made the noise complaint, because she purposely remained anonymous. Gail Gilbert also was not undertaking a role that is typically assumed by the police officers, i.e. she was not calling to request officers to be dispatched to a possible crime—she pretended to be a private citizen making a legitimate noise complaint.

Next, Defendants contend that the fictitious noise complaint is the only basis for the conspiracy claim, and accordingly, qualified immunity is appropriate for all Defendants because there is no showing that the phone call violated the Plaintiffs' constitutional rights. This argument relies on a misunderstanding of the Plaintiffs' civil conspiracy claim. The Plaintiffs certainly point to the noise complaint as a part of the conspiracy to conduct "the planned unlawful raid." However, the Plaintiffs do not, necessarily, allege that the noise complaint was unconstitutional, just that it was placed in furtherance (to justify) the unconstitutional conduct. As the preceding analysis shows, the Plaintiffs have alleged that the Defendants conspired to carry out at least one unconstitutional act, the warrantless entry onto the Pritchards' property. As evidence of the plan and conspiracy, the Plaintiffs point to the meeting between the Lt. Braley and his former police academy commander, the meetings prior to the party between the Defendant officers, Lt. Braley's allegedly fabricated observations of the party, the false noise complaint, inconsistent testimony from Defendant officers, and the anonymous letters—allegedly from Hamilton Township police officers— that roughly accused Defendant officers of entering into a conspiracy to conduct this unlawful activity.

If we had determined that there was no underlying constitutional harm, we would grant qualified immunity here, *see Revis*, 489 F.3d at 386–87, however, our determination that a

constitutional violation could be proven at this stage of the litigation defeats the Defendant officers'

assertion of qualified immunity, *see White v. McKinley*, 519 F.3d 806, 815 (8th Cir. 2008).

Accordingly, we affirm the district court's denial of qualified immunity as to this claim.

## B. The Denial of Statutory Immunity

Next, we consider the Defendants' assertion of statutory immunity as to the Plaintiffs' state-

law claims. Clark and Christman bring state-law claims of false arrest and malicious prosecution

against Lt. Johnson and Officer Gilbert. Mary Pritchard brings a state-law claim of intentional

infliction of emotional distress against Lt. Johnson, Lt. Braley and Officer Gilbert. Defendants

maintain that they were entitled to summary judgment premised on statutory immunity. The district

court held that material disputes of fact preclude a grant of summary judgment on this basis.

We conduct *de novo* review of a district court's denial of summary judgment based on

statutory immunity from suit. *Cresher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). "Summary

judgment is proper where there exists no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law." *Id*. (citing Fed. R. Civ. P. 56(c)). The court must construe

the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The central issue is 'whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law.'" *Cresher*, 477 F.3d at 796 (quoting *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

Ohio provides statutory immunity against civil liability to government employees *unless* one

of the following exceptions applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code . . .

Ohio Rev. Code § 2744.03(A)(6). Plaintiffs maintain that subsection (b) applies here because they allege that the Defendants' acts were done with "malicious purpose, in bad faith, or in a wanton or reckless manner." Defendants maintain that there is no evidence that their conduct falls under this exception.

One Ohio court recently explained how Ohio courts have interpreted this exception to statutory immunity:

One acts with a malicious purpose if one willfully and intentionally acts with a purpose to cause harm. Malice includes the willful and intentional design to do injury, or the intention or desire to harm another through conduct which is unlawful or unjustified. Bad faith is defined as a dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive or ill will. A person acts wantonly if that person acts with a complete failure to exercise any care whatsoever. One acts recklessly if one is aware that one's conduct creates an unreasonable risk of physical harm to another[.] Recklessness is more than mere negligence in that the person must be conscious that his [or her] conduct will in all probability result in injury.

*Spears v. Akron Police Dept.*, No. 2487, 2010 WL 625822, at *4 (Ohio. Ct. App. Feb. 25, 2010) (unpublished); *see also Woods v. Miamisburg City Schs.*, 254 F. Supp. 2d 868, 881 (S.D. Ohio 2003) (conducting a similar review of Ohio state court decisions that define these terms). Furthermore, looking specifically to a claim of malicious prosecution, malice means "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Criss v. Springfield*

*Twp.*, 564 N.E.2d 440, 443 (Ohio 1990); *see also Melanowski v. Judy*, 131 N.E. 360, 361 (Ohio 1921) ("In actions for malicious prosecution, while malice is an essential element, the want of probable cause is the real gist of the action. If want of probable cause be proven, the legal inference may be drawn that the proceedings were actuated by malice.").

As to the appeals of Christman and Clark, Defendants argue that their conduct "cannot be described with malicious purpose, in bad faith, or in wanton or reckless manner." However, as discussed above, a jury could determine that the Defendants lacked probable cause to arrest Clark and Christman, which supports an inference of malice. *Melanowski*, 131 N.E. at 361. Plaintiffs could also demonstrate bad faith by proving that Lt. Johnson and Officer Gilbert had no reason to believe Clark and Christman were intoxicated, a necessarily element to the charge of disorderly conduct. Furthermore, bad faith and malice could be shown by proving Plaintiffs' allegations that the Defendant officers caused a fictitious noise complaint to be placed in hopes of justifying the Pritchard raid. Accordingly, we find that Plaintiffs have alleged sufficient facts such that a reasonable jury could conclude that Lt. Johnson and Officer Gilbert were acting with malice or bad faith in arresting and charging Clark and Christman.

As to Mary Pritchard's claim, Defendants first argue that Lt. Braley's alleged abusive and aggressive conduct toward Mary Pritchard is insufficient for a showing of malice. Defendants rely on *Stoll v. Gardner*, which held that a police officer's inappropriate and unprofessional comments, even when viewed in the light most favorable to the plaintiff, did not constitute a showing of malice. 912 N.E.2d 165, 173 (Ohio Ct. App. 2009). However, Lt. Braley's behavior is not the only piece of evidence that Mary Pritchard has provided. She has also alleged that Lt. Braley, and the other

Defendant officers, concocted this operation at the behest Lt. Braley's friend, and that there was nothing to justify the officers "raiding" the birthday party on her property. If true, this is sufficient for a showing of malice. Likewise, proving that the false noise complaint was placed without justification would be sufficient for a showing of malice. Because a jury could reasonably conclude that the Defendants acted with bad faith or malice, we conclude that disputed issues of material fact preclude a finding of statutory immunity as to these claims. Accordingly, we affirm the district court's denial of statutory immunity.

### III. CONCLUSION

For these reasons, we find that we are without jurisdiction to hear Lt. Johnson and Officer Gilbert's appeal of the denial of qualified immunity as to the Pritchards' unlawful search claim, and we **AFFIRM** the judgment of the district court as to the remainder of the claims.